1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19

| | |
|---|---|
| JOSE MEDINA CAMACHO and RHONDA COTTA, *individually and on behalf of all others similarly situated*, <div align="right">Plaintiffs,</div> v. THE CONTROL GROUP MEDIA COMPANY, LLC, and INSTANT CHECKMATE, LLC, <div align="right">Defendants.</div> | Case No. 21-cv-1954-MMA (MDD) **ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND CONSOLIDATING ACTIONS** [Doc. No. 20] |

20      Plaintiffs Jose Medina Camacho and Rhonda Cotta (individually "Plaintiff

21   Camacho" and "Plaintiff Cotta," and collectively "Plaintiffs") bring this putative class

22   action against Defendants The Control Group Media Company, LLC and Instant

23   Checkmate, LLC (individually "Defendant TCG" and "Defendant Instant Checkmate,"

24   and collectively "Defendants") alleging California and Alabama right of publicity claims.

25   Doc. No. 1 ("Compl.").  Defendants now move to dismiss the Complaint on the grounds

26   that Plaintiffs agreed to arbitration, Plaintiffs did not sufficiently state a claim under

27   California and Alabama law, federal law bars Plaintiffs' claims, and Plaintiffs' claims are

28   barred by California's anti-SLAPP statute, and request the class allegations be stricken.

*See* Doc. No. 20-1 at 11.[1]  Plaintiffs filed an opposition, to which Defendants replied. *See* Doc. Nos. 23, 24.  The Court found the matters suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1.  Doc. No. 25.  For the reasons set forth below, the Court **DENIES** Defendants' motion and **CONSOLIDATES** the related actions under the present case, the lead case number 21-cv-1954-MMA (MDD).

## I. BACKGROUND[2]

Plaintiffs' action arises from Defendants' alleged misappropriation of Plaintiffs' identities without consent for a commercial benefit.  Compl. ¶¶ 29–30.  Both Defendant TCG and Defendant Instant Checkmate are companies.  *Id.* ¶¶ 9–10.  "Defendants operate InstantCheckmate.com, a website that purports to sell access to a database containing proprietary 'detailed reports' about people to anybody willing to pay for a monthly subscription."  *Id.* ¶ 1.  Defendant TCG "controls and operates four 'people search' websites"—including InstantCheckmate.com, the people search website at issue in the present action.  *Id.* ¶¶ 21, 24.  InstantCheckmate.com (the "Website") is "a website that sells access to comprehensive background reports 'on just about anyone.'  The reports are compiled in part from databases and public record repositories."  *Id.* ¶ 24.  As alleged in the Complaint, Defendant TCG "designed each of the People Search Websites to operate in a substantially similar way: to misappropriate consumers' identities for its own commercial gain by using Plaintiffs' and the Class members' identities in conjunction with an offer to purchase a paid subscription to access its database."  *Id.* ¶ 22.  Defendant TCG "created and controls the marketing and advertising of all the People

---

[1] All citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

[2] Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the Complaint.  *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976).

Search Websites, including the Marketing Page solicitations at issue in this case." *Id.* ¶ 23.

Regarding marketing their services, the Complaint provides the following:

Defendants encourage consumers to perform a free "people search" on their website. When consumers perform a free search for an individual—by typing the individual's first and last name into a search bar—Defendants display webpages featuring the searched individual's full name alongside certain uniquely identifying information, including age, location, and names of relatives. The purpose of these pages is twofold: first, they show potential customers that Defendants' database contains detailed reports for the *specific* individual they searched for and represent that the detailed report contains much more information about the individual than the "free" report, and second, they offer to sell them a paid subscription to their services, where they can access detailed reports about *anybody* in their database. In other words, Defendants do not offer to sell detailed reports about the individuals searched on their websites, but rather, use their identities to sell subscriptions to Defendants' paid services.

*Id.* ¶ 2. As to the results page rendered after a "free" search is performed, "[o]nce a consumer selects an individual . . . from the Instant Checkmate Marketing Page, Instant Checkmate displays a checkout page with two offers to purchase a subscription to the website," and the offer page reads: "(i) 'MOST POPULAR' tier costing $35.12 per month with access to one month of unlimited reports and (ii) the 'Power User' tier costing $84.28, with access to three months of unlimited reports." *Id.* ¶ 27. Further, "[w]hile a consumer may visit InstantCheckmate.com to search and potentially obtain information on one specific individual, Instant Checkmate ultimately offers for sale an entirely different product." *Id.* ¶ 28. "Instant Checkmate is not offering for sale only information on the searched individual." *Id.* "Instead, Instant Checkmate is offering for sale a monthly subscription service that grants the purchaser unlimited access to background reports on anybody in its database." *Id.* "The searched-for individual's report is a small part of a large database with reports on millions of people." *Id.* According to Plaintiffs, Defendants' marketing pages "have a commercial purpose in that

they promote the Defendants' website and encourage potential customers to purchase paid subscriptions to access reports in their database." *Id.* ¶¶ 48, 57.

Plaintiffs "discovered that Defendants were using their identities to solicit the purchase of paid subscriptions to InstantCheckmate.com." *Id.* ¶ 31. "Instant Checkmate never obtained written consent from Plaintiffs and Class members to use their names for any reason," nor were they provided with any notification that "their names would appear on the Instant Checkmate Marketing Page in conjunction with an offer to purchase subscription access to its database of reports." *Id.* ¶¶ 30, 33. Additionally, "Defendants specifically identified Plaintiffs by their full names, ages, locations, and names of immediate family members on the Instant Checkmate Marketing Page." *Id.* ¶ 32. "Defendants have never provided Plaintiffs with compensation of any kind for their use of Plaintiffs' identities in connection with any advertising on Instant Checkmate or any other website." *Id.* ¶ 34. Further, "Plaintiffs are not and have never been customers of any of Defendants' websites. . . . [T]hey have no relationship with [Defendants] whatsoever." *Id.* ¶ 35. Plaintiff Cotta is a resident of California and brings her class claim under California law. *Id.* ¶ 8. Plaintiff Camacho is a resident of Alabama and brings his class claim under Alabama law. *Id.* ¶ 7.

Plaintiffs allege that "[b]y using their identities in advertisements to sell their services, Defendants derived economic value from Plaintiff . . . and, in turn, deprived Plaintiff . . . of such value. Defendants did not compensate Plaintiff . . . for their use of Plaintiff['s]" identity, which "resulted in economic injury to Plaintiff." *Id.* ¶¶ 51, 60. Plaintiffs bring two causes of action against Defendants: (1) use of Plaintiff Cotta's identity in violation of California's right of publicity statute, Cal. Civ. Code. § 3344, on behalf of a California class; and (2) use of Plaintiff Camacho's identity in violation of Alabama's right of publicity statute, Ala. Code §§ 6-5-770 to -773, on behalf of an Alabama class. *Id.* ¶ 6. Defendants move to dismiss both causes of action against them based on the following grounds: (1) Plaintiffs must arbitrate their dispute; (2) Plaintiffs' class allegations should be stricken; (3) Plaintiff Cotta fails to state a claim under

California Civil Code § 3344; (4) Plaintiff Camacho fails to state a claim under the Alabama Right of Publicity Act; (5) the Communications Decency Act bars Plaintiffs' claims; (6) the First Amendment bars Plaintiffs' claims; (7) Plaintiffs' liability theories violate the Dormant Commerce Clause; and (8) Plaintiffs' claims are barred by California's anti-SLAPP statute. *See* Doc. No. 20-1.

## II. ARBITRATION

Defendants argue Plaintiffs agreed to arbitration, so the Court must direct the parties to proceed to arbitration. Doc. No. 20-1 at 13; Doc. No. 24 at 6. In the alternative, Defendants request limited discovery to learn about Plaintiffs' counsel's agency authority or ratification. Doc. No. 20-1 at 15–16. Plaintiffs assert in opposition that Defendants "failed to establish that the parties agreed to arbitrate this dispute." Doc. No. 23 at 11.

### A. Motion to Compel Arbitration

As an initial matter, Defendants frame their request to send the case to arbitration as a motion under Federal Rule of Civil Procedure 12(b)(3). Doc. No. 20-1 at 13. Plaintiffs argue that Rule 12(b)(3) is not the proper avenue to request enforcement of an arbitration clause. Doc. No. 23 at 10. However, Defendants' arguments appear akin to a motion to compel arbitration under the Federal Arbitration Act ("FAA") in that they request the Court enforce an arbitration agreement and urge that the policy favors such action. *See* Doc. No. 20-1 at 13–15. Further, Defendants and Plaintiffs both cite to cases that discuss the FAA. *See id.* at 15; Doc. No. 23 at 10–15; Doc. No. 24 at 6. Denying the motion in this case based purely upon the title of the motion would waste time as the motion itself reads as a motion to compel arbitration. *See Lemberg v. LuLaRoe, LLC*, No. ED CV 17-02102-AB (SHKx), 2018 WL 6927836, at *3 (C.D. Cal. Mar. 1, 2018) ("This Court finds that a motion to compel arbitration is akin to a motion under Rule 12, which is in line with decisions from within this Circuit and other Circuits. . . . While courts may disagree as to whether a motion to compel arbitration constitutes a motion pursuant to Rules 12(b)(1), 12(b)(3), or 12(b)(6), courts generally agree that such a motion is a Rule

12(b) motion."); *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009) (reviewing a 12(b)(3) motion as a motion to compel arbitration); *Cedars-Sinai Med. Ctr. v. Glob. Excel Mgmt., Inc.*, No. CV 09-3627 PSG (AJWx), 2010 WL 5572079, at *2 (C.D. Cal. Mar. 19, 2010); *cf. Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 140 (2d Cir. 2008) (declining to review a motion to dismiss as a motion to compel arbitration because the motion "did not explicitly request the district court to 'direct that arbitration be held'" and instead framed the argument in judicial preclusion terms) (quoting 9 U.S.C. § 206)); *Bombardier Corp. v. Amtrack*, 333 F.3d 250, 254 (D.C. Cir. 2003) (declining to review a motion to dismiss as a motion to compel arbitration because the motion did not "invoke[] FAA's policy favoring enforceability of arbitration agreements and ask[] the Court to order arbitration" and was thus not analogous to a motion to compel arbitration).  Thus, the Court construes Defendants' request as a motion to compel arbitration pursuant to the FAA.

"Although the court normally cannot consider matters outside the pleadings in a Rule 12(b)(6) motion to dismiss, . . . it may consider such evidence in deciding a motion to compel arbitration."  *Regents of Univ. of Cal. v. Japan Sci. & Tech. Agency*, No. CV 14-04419, 2014 WL 12690187, at *3 n.24 (C.D. Cal. Oct. 16, 2014); *see also Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1001, 1007 (N.D. Cal. 2011) ("While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006))).

Defendants attach copies of the Website's Terms of Use ("TOU") and a declaration from The Control Group Media Company Senior Vice President of Product.  S*ee* Doc. No. 20-2 at 2–9 ("Mahon Decl."), 66–84 ("Exh. B"), 85–104 ("Exh. C"). Defendants seek to compel arbitration.  Thus, the Court considers both TOU documents and the declaration in ruling on Defendants' motion to compel arbitration.

**B.     Legal Standard**

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement."  9 U.S.C. § 4.  Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration.  *Id.*  The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Federal courts are required to rigorously enforce an agreement to arbitrate.  *See id.*

In determining whether to compel a party to arbitration, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)); *see also* 9 U.S.C. § 4.  If the Court finds that the answers to both questions are "yes," then the Court must compel arbitration.  *Chiron Corp.*, 207 F.3d at 1130.  A court's circumscribed role in making these inquiries "leav[es] the merits of the claim and any defenses to the arbitrator."  *Id.* (quoting *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991)).

As to the first inquiry—whether the parties agreed to arbitrate—courts adopt a standard similar to summary judgment.  *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991); *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1097 (S.D. Cal. 2018); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017).  Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Courts must apply ordinary state law principles governing formation of a contract in determining whether to invalidate an agreement to arbitrate.

*Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  As such, arbitration agreements may be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  *Concepcion*, 563 U.S. at 339 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  In assessing whether there is an agreement to arbitrate, the presumption and policy in favor of arbitration do not apply, and instead, the issue is determined through standard contract law principles.  *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006); *see also EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002).  Additionally, the party "seeking to compel arbitration 'bears the burden of proving the existence of a valid arbitration agreement by preponderance of the evidence.'"  *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 13 (Ct. App. 2021) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 915 (1997)).

As to the second inquiry—whether the agreement encompasses the dispute at issue—courts resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").  Moreover, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  Absent contractual ambiguity, "it is the language of the contract that defines the scope of disputes subject to arbitration."  *Waffle House, Inc.*, 534 U.S. at 289.

## C.  Discussion

Defendants argue the Court should compel Plaintiffs to arbitrate their claims pursuant to the arbitration agreement contained within the Website's TOU.  Doc. No. 20-1 at 13–14.  Defendants further their argument by explaining "[t]o perform a search on

[Instant Checkmate]'s website, a user must click a button, below which appears a message indicting that clicking constitutes affirmative consent to the applicable [TOU]." *Id.* at 13. The TOU, in relevant part, provide that any claims, controversies, or disputes shall be resolved by arbitration. *Id.*; *see also* Exh. B at 66–67. While acting as Plaintiffs' agents, Defendants claim that Plaintiffs' counsel agreed to Defendants' TOU, thereby binding Plaintiffs to the TOU that included an arbitration agreement. *See* Doc. No. 20-1 at 13–14. Specifically, Defendants assert that "Plaintiffs are bound to the TOU, including the agreement to arbitrate" because counsel's search of Plaintiffs' names was "within the scope of Plaintiffs' counsel's agency," Plaintiffs ratified the agreement, and but for Plaintiffs' counsel's search, there would have been no basis for a claim. *Id.* at 14–15.

Plaintiffs respond by challenging a signatory's ability to bind nonsignatories—here, Plaintiffs—to an arbitration agreement. Doc. No. 23 at 12. Plaintiffs assert that there is no evidence that counsel intended to act on behalf of Plaintiffs, when agreeing to the TOU, and bind them to the TOU or whether counsel even had authority to do so. *Id.* at 12, 14. Plaintiffs further argue that "[a]ttorneys regularly engage service providers while investigating and prosecuting cases for clients, and when they do so, it is the lawyers—not the clients—who are bound to any resulting agreements." *Id.* at 12–13. Finally, Plaintiffs contend that "one—if not the primary—reason [counsel] used [the Website] was to satisfy his Rule 11 obligations." *Id.* at 13.

The Court proceeds by assessing whether a valid arbitration agreement exists and whether it encompasses the dispute at issue. *See Kilgore*, 718 F.3d at 1058 (quoting *Chiron Corp.*, 207 F.3d at 1130).

### 1.  Whether a Valid Arbitration Agreement Exists

#### a.  Governing State Law

The first factor in assessing whether to compel arbitration requires the Court to apply ordinary state law principles of contract formation. *See Ferguson*, 298 F.3d at 782.

A district court sitting in diversity must apply the choice-of-law rules of the forum state. *Lazar v. Kroncke*, 862 F.3d 1186, 1194 (9th Cir. 2017). In the present action, the

issue concerns whether nonsignatories are bound by the TOU, so the Court is unable to consider any choice-of-law provision in the arbitration agreement should one exist.  *See In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) ("A choice-of-law clause, like an arbitration clause, is a contractual right and generally may not be invoked by one who is not a party to the contract in which it appears." (quoting *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1165 (9th Cir. 1996))); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (supplying that whether a choice-of-law provision applies depends upon whether the parties had agreed to being bound by the contract in which it appears).  Thus, the Court must apply the choice-of-law principles of the forum state—California—to determine which state's law will govern the agency issue as it relates to the arbitration agreement.  *In re Henson*, 869 F.3d at 1059.  Pursuant to California's choice-of-law analysis, the Court only applies another state's law if a proponent identifies an "applicable rule of law in each potentially concerned state" that "materially differs from the law of California."  *Wa. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001).

Here, both Plaintiffs and Defendants cite to California and Alabama case law concerning the issue of agency as it relates to arbitration agreements.  *See, e.g.*, Doc. No. 20-1 at 14; Doc. No. 23 at 13–15.  However, the parties primarily rely on California law.  *See* Doc. No. 20-1 at 14–15; Doc. No. 23 at 13–14.  In fact, Plaintiffs assert the outcome would be the same under both states' laws.  Doc. No. 23 at 14 n.4.  And Defendants cite to both California and Alabama cases to support each of their points.  Doc. No. 20-1 at 14–15.  Most importantly, neither party argues that Alabama agency principles materially differ from those in California.  Therefore, the Court looks to California state law principles to determine whether Plaintiffs—as nonsignatories—are bound to the arbitration agreement.  *See In re Henson*, 869 F.3d at 1059–60.

### b.   Nonsignatory-Principal and Signatory-Agent

Through Defendant TCG's Senior Vice President of Product, Defendants put forth evidence to show that Plaintiffs' counsel performed searches on the Website "to generate

screenshots used in Plaintiffs' Complaint" and thereby agreed to the TOU.  Mahon Decl. at 4; Doc. No. 20-1 at 13.  Defendants argue that Plaintiffs' counsel is their agent and acquiring screenshots to include in a complaint is within the scope of counsel's agency, so Plaintiffs are bound by the TOU and the arbitration agreement contained therein.  Doc. No. 20-1 at 14.  Defendants additionally assert that even if Plaintiffs' counsel acted without authority, Plaintiffs are still bound by the TOU because they ratified the agreement when they "incorporat[ed] into the Complaint information and screenshots gathered from counsel from [the Website]."  *Id.*  Finally, Defendants appear to assert that but for counsel searching Plaintiffs' names, a claim would not have existed.  *Id.* at 15. Plaintiffs respond that "litigants cannot be compelled to arbitrate disputes that they did not agree to arbitrate," Defendants do not argue Plaintiffs agreed to arbitration by agreeing to the TOU themselves, and a nonsignatory is not generally bound to an arbitration agreement.  Doc. No. 23 at 11–12.  Plaintiffs further assert that the intent of Plaintiffs' counsel is critical as to whether an undisclosed principal becomes a party to a contract when the principal lacked intent to bind the agent, and counsel lacked such intent to bind Plaintiffs.  *Id.* at 12.  Rather, counsel's purpose in using the Website was to fulfill his Rule 11 obligations.  *Id.* at 13.  Finally, Plaintiffs notes that "absent a client's express authorization to agree to arbitration—of which there is no evidence here—"counsel has no apparent authority to bind a client to an arbitration agreement simply by virtue of his representation.  *Id.* at 14 (quoting *Blanton v. Womancare, Inc.*, 696 P.2d 645, 649 (Cal. 1985)).  To this point, Plaintiffs could not have ratified their counsel's actions, and even if they could, there is no evidence that they did.  *Id.* at 14–15.

"[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)).  Nonsignatories "of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."  *Comer*, 436 F.3d at 1101 (quoting *Letizia v. Prudential Bache Sec.,*

*Inc.*, 802 F.2d 1185, 1187–88 (9th Cir. 1986)).  However, under California law, an agency relationship does not guarantee that a nonsignatory will be bound to an arbitration agreement.  *Cohen v. TNP 2008 Participating Notes Program, LLC*, 243 Cal. Rptr. 3d 340, 356 (Ct. App. 2019).  Each California case that has found nonsignatories were "bound to arbitrate is based on facts that demonstrate, in one way or another, the signatory's implicit authority to act on behalf of the nonsignatory." *Jensen v. U-Haul Co. of Cal.*, 226 Cal. Rptr. 3d 797, 804 (Ct. App. 2017); *see County of Contra Costa v. Kaiser Found. Health Plan, Inc.*, 54 Cal. Rptr. 2d 628, 632 (Ct. App. 1996).  Further, courts have found that an "agency relationship between the nonsignatory and the signatory must make it 'equitable to compel the nonsignatory' to arbitrate." *Cohen*, 243 Cal. Rptr. 3d at 359 (quoting *Jensen*, 226 Cal. Rtpr. 3d at 802); *see also Matthau v. Superior Court*, 60 Cal. Rptr. 3d 93, 97–98 (Ct. App. 2007); *County of Contra Costa*, 54 Cal. Rptr. 2d at 631–32.

Here, the Court finds that there is no dispute Plaintiffs' counsel is their agent.  *See Blanton*, 696 P.2d at 649 ("As a general proposition the attorney-client relationship, insofar as it concerns the authority of the attorney to bind his client by agreement or stipulation, is governed by the principles of agency." (citing *Fidelity & Cas. Co. of N.Y. v. Abraham*, 161 P.2d 689, 693 (Ct. App. 1945))); *Callahan v. PeopleConnect, Inc.* (*Callahan I*), No. 20-cv-09203-EMC, 2021 WL 1979161, at *1 (N.D. Cal. May 18, 2021), *aff'd*, No. 21-16040, 2022 WL 823594, *1 (9th Cir. Mar. 18, 2022).  The matter thus turns on the scope of counsel's authority.  Defendants carry the "burden to prove the scope of counsel's authority." *Callahan I*, 2021 WL 1979161, at *4 (citing *Inglewood Teachers Ass'n v. Pub. Emp't Relations Bd.*, 278 Cal. Rptr. 228, 234–35 (Ct. App. 1991)); *see also Ellerd v. County of Los Angeles*, 273 Fed. App'x 669, 670 (9th Cir. 2008).

The Court notes that an identical case, brought against a similar company associated with one of Defendants and that is represented by the same defense counsel, was previously filed in the Northern District of California.  *See Callahan I*, 2021 WL

1979161, at *1.[3]  In *Callahan I*, the defendants brought a motion to compel arbitration with the same argument that the plaintiffs' attorney bound the client to an arbitration agreement when accepting the terms of use on a "people search" website.  *Id.*  The district court, applying California law, found that pursuant to *Blanton v. Womancare, Inc.*, the plaintiffs' attorneys could not bind their clients to arbitration solely by virtue of their representation absent any authority or ratification.  *Id.* at *6.  The district court reasoned that there was no express authorization from the plaintiffs, the attorneys' representation did not give rise to apparent authority, and the plaintiffs clearly did not ratify the attorneys' actions.  *Id.*  The court elaborated that the defendant's argument that the attorney bound their client to an arbitration agreement without consent had a result similar to cutting off a plaintiff's access to a judicial forum simply because the attorney was fulfilling their duties under the Federal Rules of Civil Procedure to investigate the case prior to filing a complaint.  *Id.*  Thus, the court denied the motion to compel arbitration.  *Id.* at *7.  The district court's decision was later affirmed by the Ninth Circuit on appeal.  *Callahan v. PeopleConnect, Inc.*, No. 21-16040, 2022 WL 823594, at *1–2 (9th Cir. Mar. 18, 2022) ("Plaintiffs' counsel did not have implied actual authority or

---

[3] Another similar case is currently pending in the Western District of Washington.  *See Knapke v. PeopleConnect, Inc.*, 553 F. Supp. 3d 865 (W.D. Wash. 2021), *vacated*, No. 21-35690, 2022 WL 2336657, at *1 (9th Cir. June 29, 2022).  Defendants provided the Court with supplemental authority concerning a Ninth Circuit opinion published in this case.  *See* Doc. No. 31.  However, the Court finds this case is analogous to *Callahan I* rather than *Knapke* because California law applies on the issue of agency.  In *Knapke*, the Ninth Circuit vacated the district court's denial of the defendants' motion to compel arbitration and remanded because under Washington law "[i]t is unclear whether [the plaintiffs] had an attorney-client relationship, and thus an agent-principal relationship, when [counsel] agreed to the Terms of Service."  *Knapke v. PeopleConnect, Inc.*, No. 21-35690, 2022 WL 2336657, at *4 (9th Cir. June 29, 2022).  However, the law in California concerning attorney-client relationships, agency, and authority to bind a client to an arbitration agreement is not unclear—*Blanton* addressed the very issue of counsel's scope of authority regarding arbitration agreements.  The district court's denial of the defendants' motion to compel arbitration in *Callahan I* was affirmed by the Ninth Circuit, albeit in an unpublished opinion, on the grounds that the plaintiffs' counsel lacked authority to bind their clients and the plaintiffs did not ratify the agreement.  *Callahan*, 2022 WL 823594, at *1.  Further, it is unclear whether the court's holding applying Washington law in *Knapke* is binding on this Court that applies California law.

apparent authority to bind his clients to arbitration.  The California Supreme Court has held that attorneys may not impair their client's substantial rights—including by binding the client to arbitration—without the client's consent. . . .  Plaintiffs did not ratify their counsel's agreement to arbitrate by accepting the benefits of the agreement or by failing to repudiate it.").

As the court in *Callahan I* provided, "[i]n short, absent client consent or ratification, a lawyer cannot bind a client to an arbitration agreement by the virtue of the attorney-client relationship alone." *Callahan I*, 2021 WL 1979161, at 5; *see Toal v. Tardif*, 101 Cal. Rptr. 3d 97, 107 (Ct. App. 2009) ("[A] client is bound by an arbitration agreement signed by his or her counsel only if the client consented to or ratified the agreement.").  In *Blanton*, the Supreme Court of California addressed the "specific issue of when a lawyer, as agent, can bind a client to an arbitration contract – i.e., waive the right to a judicial forum." *Callahan I*, 2021 WL 1979161, at *5 (citing *Blanton*, 696 P.2d 645).  The court in *Blanton* provided that the client "is bound by the agreement only if the attorney had either implied actual authority or apparent authority to enter into the agreement on her behalf," or if the client provided subsequent ratification. *Blanton*, 696 P.2d at 650.  An attorney's apparent authority concerns "that which attorneys are normally authorized to do in the course of litigation manifested by the client's act of hiring an attorney" and "actual authority implied in law." *Id.*  However, an attorney does not maintain the authority "to 'impair the client's substantial rights or the cause of action itself'" simply by virtue of representing the client. *Id.* (citing *Linsk v. Linsk*, 449 P.2d 760, 762 (Cal. 1969)).  The California Supreme Court elaborated that an attorney, simply by virtue of his or her representation, does not have the authority to "settle and compromise a claim," "stipulate to a matter which would eliminate an essential defense," "agree to entry of default judgment," "stipulate that only nominal damages may be awarded," and "agree to an increase in the amount of the judgment against his client." *Id.* (first quoting *Whittier Union High Sch. Dist. v. Superior Court*, 136 Cal. Rptr. 86, 89 (Ct.

App. 1977); and then quoting *Linsk*, 74 Cal. Rptr. At 548).  As to these types of decisions, the court reasoned:

> [These decisions] differ from the routine and tactical decisions which have been called 'procedural' both in the degree to which they affect the client's interest, and in the degree to which they involve matters of judgment which extend beyond technical competence so that any client would be expected to share in the making of them.

*Id.*; *see also Levy v. Superior Court*, 41 Cal. Rptr. 2d 878, 881–82 (1995) ("[T]he stipulation to submit to binding arbitration . . . involved a substantial right because it would have, without the client's consent, diverted the dispute from one forum, the court, to a different one, arbitration." (citing *Blanton*, 696 P.2d at 652)).

Apparent authority is consequently created "by the acts of the principal in placing the agent in such a position that he appears to have the authority which he claims or exercises.  If authority is lacking, then nothing the agent does or says can serve to create it."  *Blanton*, 696 P.2d at 651; *see also Burns v. McCain*, 290 P. 623 (Cal. Ct. App. 1930) (providing that the defendant lacked awareness of the stipulation her attorney had signed and finding the stipulation should not be enforced because the attorney lacked authority to enter into it).  The *Blanton* court thus concluded that "an attorney, merely by virtue of his employment as such, has no apparent authority to bind his client to an agreement for arbitration."  *Blanton*, 696 P.2d at 653.  The court reasoned that "the client has a right to be consulted, and his consent obtained, before the dispute is shifted to another, and quite different, forum, particularly where the transfer entails the sort of substantial consequences presented here" when the attorney was hired to litigate in a judicial forum.  *Id.*

As to ratification specifically, California law provides that "ratification through acceptance of benefits requires knowledge of the relevant circumstances."  *LAOSD Asbestos Cases*, 240 Cal. Rptr. 3d 1, 21 (Ct. App. 2018) (citing *Johnson v. Cal. Interurban Motor Transp. Ass'n*, 74 P.2d 1073, 1081 (Ct. App. 1938)).

Furthermore, as noted by the district court in *Callahan I*, the *Blanton* holding that an attorney cannot bind a client to an arbitration agreement simply by virtue of representation absent consent or ratification "is consistent with federal law, which requires a *knowing* waiver of the right to a judicial forum." *Callahan I*, 2021 WL 1979161, at *5 (citing *Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1155 (9th Cir. 1998)).

Here, Defendants have not met their burden of proving that Plaintiffs' counsel's scope of authority included ability to agree to arbitration. Defendants do not put forth evidence demonstrating that Plaintiffs' counsel's account creation was undertaken on Plaintiffs' behalf or that the action was subsequently ratified. And in any event, the Complaint does not show that Plaintiffs provided their counsel with express authorization or that their counsel had implied authority to enter into an arbitration agreement. The Court similarly finds there was no indication that Plaintiffs ratified the arbitration agreement subsequent to counsel's search.

As to apparent or implied authority, the California Supreme Court's holding in *Blanton* controls on this issue—an attorney's representation of a client does not create apparent or implied authority to enter into an arbitration agreement absent client consent or ratification. *Blanton*, 696 P.2d at 653. In their motion, Defendants cite to *Indep. Living Res. Ctr. S.F. v. Uber Techs., Inc.*, No. 18-cv-06503-RS, 2019 WL 3430656, at *1 (N.D. Cal. July 30, 2019) [hereinafter *Uber*], to support their agency arguments.[4] Doc. No. 20-1 at 15. However, Defendants' arguments and reliance on this case are without

---

[4] Defendants only cite to *Blanton* in their reply. *See* Doc. No. 24 at 7–8. Defendants argue Plaintiffs misinterpret *Blanton* and provide that "the *Blanton* plaintiff disavowed her attorney's actions and terminated the relationship." *Id.* at 7–8. Defendants proceed to assert that California law conflicts with any "categorical rule that an attorney must have express authority to bind a client to an arbitration agreement, but not other agreements." *Id.* at 8. The Court is not persuaded by Defendants' argument and follows the analysis provided above, which is the result similarly reached in the *Callahan I* opinion affirmed by the Ninth Circuit. Further, California cases that have found nonsignatories were "bound to arbitrate [were] based on facts that demonstrate, in one way or another, the signatory's implicit authority to authority to act on behalf of the nonsignatory." *Jensen*, 226 Cal. Rptr. at 804. And *Blanton* held that an attorney cannot bind their client simply by virtue of their representation—the exact issue at play in the present matter.

merit.  First, the court in *Uber* lacked any analysis of, let alone reference to, *Blanton*.  *See generally Uber*, 2019 WL 3430656, at \*1–4.  Second, the court in *Uber* addressed the issue of whether the paralegal working on plaintiff's case "was acting within the scope of agency when she tested the Uber App" after the plaintiffs "dispatched their agents to affirmatively test the Uber application from the Uber application in order to bolster their claim of discrimination." *Id.* at \*4.  The crux of the case was that the factual predicate for the plaintiff's underlying claims arose from the paralegal's research, using the Uber application.  *See id.*  However, in the present case, the basis of Plaintiffs' claims do not arise because of counsel's use of the website, and use of the website was not needed to understand the foundation of Plaintiffs' claims.  *See Callahan I*, 2021 WL 1979161, at \*6.

Moreover, Plaintiffs argue that Plaintiffs' counsel used the Website as part of their investigation "to satisfy his Rule 11 obligations."  Doc. No. 23 at 13.  Defendants assert in reply that "an attorney's Rule 11 obligation only arises when acting on a client's behalf, and Rule 11 also imposes obligations on clients directly."  Doc. No. 24 at 8.  However, the Court finds that counsel's actions were more likely made in order to satisfy Rule 11 and do not deem Defendants' argument persuasive.  *See also Callahan I*, 2021 WL 1979161, at \*6 (finding that the counsel not only searched the clients' names to satisfy Rule 11 but also to satisfy the plausible pleading standard under *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly*).  While counsel may have acted on their client's behalf to satisfy Rule 11 obligations, this fact alone does not prove counsel had authority to *bind* their clients to arbitration.  Further, Plaintiffs' counsel's actions in the present case "do not serve as the *basis* of Plaintiffs' claims – i.e., counsel's use of the . . . website is not the factual predicate for Plaintiffs' claims." *Callahan I*, 2021 WL 1979161, at \*6.  As Plaintiffs point out, *see* Doc. No. 23 at 14, the *Callahan I* court effectively synopsized the problem with Defendants' arguments:

> The Court is troubled by [the defendant's] suggestion that a plaintiff's access to a judicial forum may be cut off simply because counsel for the plaintiff fulfilled a duty under Rules 11 and 12 to investigate prior to filing suit. Under [the defendant's] position, Plaintiffs here would either file suit without doing the necessary pre-suit investigation, raising serious concerns, or would waive the right to a judicial forum, a right protected under the First Amendment. *See White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000) (stating "[t]he First Amendment . . . guarantees the right 'to petition the Government for a redress of grievances'"). Whether one calls this being on the horns of a dilemma, Hobson's choice, stuck between a rock and a hard place, or caught between Scylla and Charybdis, the resulting policy dilemma created by [the defendant's] position underscores the aptness of *Blanton*'s holding.

*Callahan I*, 2021 WL 1979161, at *6. Thus, the Court rejects Defendants' argument that Plaintiffs' ability to litigate in a judicial forum was thwarted by their counsel's likely efforts to comport with their Rule 11 obligations.

Additionally, Plaintiffs point out "Defendants present evidence only as to Mr. Camacho; Defendants do not present any evidence that [counsel] performed a search on Ms. Cotta, or that an attorney-client relationship existed between him and Ms. Cotta at the time he agreed to the Terms of Use during his search on Mr. Camacho." Doc. No. 23 at 12. The Court need not address this issue because the result would be the same either way. If there was a relationship, counsel did not have authority to bind either client to arbitration, *see infra* Section II.C.1. If counsel had not searched her name or formed a relationship at that point, then Defendants' arbitration argument would be moot. In sum, Defendants have not carried their burden to show Plaintiffs' counsel had authority to bind Plaintiffs when he agreed to the TOU.

In considering ratification, it does not appear likely that Plaintiffs received any such benefit that would have triggered ratification. To this end, there is no evidence showing that Plaintiffs knew of the arbitration agreement's existence at the time they filed the instant Complaint. *See generally* Compl. ¶ 35 ("Plaintiffs are not and have never been customers of any Defendants' websites."); Doc. No. 20-1 at 14–15. And Plaintiffs likely did not know they had the right to rescind the arbitration agreement—let

alone the fact that their attorneys had even executed it and thereby bound them to it.  If upon filing of the Complaint Plaintiffs learned of their attorneys' use of Defendants website, it would not have been possible for Plaintiffs to avoid accepting any purported benefits derived from the agreement because the Complaint had already been filed.  *See Boling v. Pub. Emp't Relations Bd.*, 216 Cal. Rptr. 3d 757, 793–95 (Ct. App. 2017) ("[R]atification [by acceptance] has no application when the principal is unable to decline the benefits of an agent's unauthorized actions."), *rev'd on other grounds*, 442 P.3d 552 (Cal. 2018); *see also Nguyen*, 763 F.3d at 1176 (providing that the enforceability of an agreement in a pure browsewrap case depends on whether "the user has actual or constructive knowledge of a website's terms and conditions").

In sum, Defendants assert that Plaintiffs' counsel's use of the Website bound Plaintiffs to the TOU, which includes an arbitration agreement.  However, the Court finds that Defendants have not carried their burden of demonstrating that Plaintiffs' counsel had authority to bind Plaintiffs to the agreement or that Plaintiffs subsequently ratified it.  Instead, the Court reaches the opposite conclusion: counsel lacked authority and Plaintiffs did not ratify their actions.  Accordingly, the Court finds that a valid and binding arbitration agreement does not exist and therefore **DENIES** Defendants' motion on this basis.

2.      *Whether the Arbitration Agreement Encompasses the Dispute at Issue*

Because the first prong of the arbitration analysis has not been met and neither party clearly focuses on the second prong, the Court does not address the second prong. *See Chiron Corp.*, 207 F.3d at 1130 (providing that both prongs must be satisfied for a court to enforce an arbitration agreement).

**D.      Request for Limited Discovery**

In the alternative, Defendants request the Court order limited discovery on the issue of agency.  Doc. No. 20-1 at 16.  Limited discovery is warranted "only if 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'"  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (quoting

9 U.S.C. § 4). Given the Court's finding concerning Plaintiffs' counsel's lack of agency authority and absent ratification, the Court finds a valid arbitration agreement does not exist. Consequently, the making of the arbitration agreement and performance of such agreement are not at issue. Thus, the Court **DENIES** Defendants' request for limited discovery.

**E.    Conclusion**

Defendants have not met their burden to prove that an agency relationship existed whereby Plaintiffs' counsel could bind Plaintiffs to an arbitration agreement. Thus, the Court finds no valid arbitration agreement exists. Accordingly, the Court **DENIES** Defendants' request to compel arbitration and **DENIES** Defendants' request for limited discovery.

## III. MOTION TO STRIKE

Defendants next argue "Plaintiffs' class allegations should be stricken under Fed. R. Civ. P. 12(f) because Plaintiffs, through their attorneys, agreed to the TOU, which contain a provision waiving their ability to pursue a class allegation." Doc. No. 20-1 at 16.

A Rule 12(f) motion to strike allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike's function is to avoid unnecessary expenditures "that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Class allegations may be stricken at the pleading stage. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975). "However, motions to strike class allegations are generally disfavored because 'a motion for class certification is a more appropriate vehicle.'" *Lyons v. Coxcom, Inc.*, 718 F. Supp. 2d 1232, 1235–36 (S.D. Cal. 2009) (quoting *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008)). Thus, "the granting of motions to dismiss class allegations before discovery has commenced is rare." *Id.* (first citing *Thorpe*, 534 F. Supp. 2d at 1125; and then quoting *In re Wal-Mart Stores,*

*Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007)); *see also Taylor v. Shutterfly, Inc.*, No. 18-cv-00266-BLF, 2020 WL 1307043, at *4 (N.D. Cal. Mar. 19, 2020) ("Thus, even if a motion to strike class allegation is considered at the pleading stage, it may only be granted under 'rare circumstances' where 'the complaint demonstrates that a class action cannot be maintained on the facts alleged.'" (quoting *Tasion v. Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, No. C-13-1803 EMC, 2014 WL 1048710, at *3 (N.D. Cal. Mar. 14, 2014))); *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 960 (N.D. Cal. 2018) ("Even courts that have been willing to entertain such a motion early in the proceedings 'have applied a very strict standard to motions to strike class allegations on the pleadings.'" (quoting *Ogola v. Chevron Corp.*, No. 14-CV-173-SC, 2014 WL 4145408, at *2 (N.D. Cal. Aug. 21, 2014))).

Here, the Court finds it is premature to resolve the class allegation issue. It is more appropriate to address this issue at a later stage of the proceedings rather than at this early stage based only on the pleadings. Thus, the Court **DENIES** Defendants' motion to strike class allegations without prejudice.

### IV. MOTION TO DISMISS

Defendants move to dismiss Plaintiffs claims on the bases that federal law bars Plaintiffs' claims, Plaintiffs insufficiently plead prima facie claims under state law, and California's anti-SLAPP statute bars Plaintiffs' claims. *See* Doc. No. 20-1 at 11.

### A.    Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6). The plausibility standard demands more than a "formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

550 U.S. at 555).  Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996) (citing *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)).  The court need not take legal conclusions as true merely because they are cast in the form of factual allegations.  *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  "However, [courts] are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996)).

In reviewing a motion to dismiss:

> [T]he "incorporation by reference" doctrine [extends] to situations in which the plaintiff's claim depends on the content of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.

*Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Davis v. HSBC Bank Nev.*, 691 F.3d 1152, 1161 (9th Cir. 2012) ("Under the 'incorporation by reference' doctrine in this Circuit, 'a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment.'" (quoting *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2001))).  The incorporation-by-reference "doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  "A court 'may treat such a document as part of the complaint, and thus may assume that its contents are true for the purposes of a motion to dismiss under Rule 12(b)(6).'" *Davis*, 691 F.3d at 1161 (quoting *Van Buskirk*, 284 F.3d at 980).  Further, "[t]his doctrine applies with equal force to internet pages as it does to printed material." *Knievel*, 393 F.3d at 1076–77 ("The Knievels do not dispute ESPN's contention that a viewer accessing the Knievels photograph must also access the surrounding pages on the EXPN.com website, nor do they dispute the authenticity of the materials and CD-ROM attached to ESPN's motion to dismiss.  When browsing the CD-ROM, we found that in order to access the photograph, one must first view, at a minimum, the nine photographs that precede it and the EXPN.com home page.  Therefore, we take into account the web pages attached to ESPN's motion to dismiss under the 'incorporation by reference' doctrine.").

Here, Defendants' motion to dismiss includes documents not contained in the initial Complaint.  *See generally* Doc. No. 20-2.  Defendants include screenshots of the Website, Exhibit A.  *See id.* at 10–64 ("Exh. A").  These screenshots appear to be from successive Website pages—the alleged steps a user would need to take in order to obtain a search result.  *See* Mahon Decl. at 3–4.  Plaintiffs provide in their Complaint screenshots of a search result that rendered Plaintiffs' names.  Compl. at 7–8.  According to Defendants, a user must first pass through the TOU page and subsequent pages in order to access that results page.  *See* Mahon Decl. at 3–4.  Further, neither party seems to dispute the authenticity of the screenshots.  And Plaintiffs do not object to Defendants'

1    request that the Court consider these screenshots.  Therefore, the Court considers the

2    screenshot exhibit, Exhibit A, as proper subject of incorporation-by-reference to the

3    extent that the document is not a means to "short-circuit the resolution of a well-pleaded

4    claim" by "serv[ing] to dispute facts stated in a well-pleaded complaint." *Khoja*, 899

5    F.3d at 1003.

6         Accordingly, the Court may consider the screenshots, *see* Exhibit A, attached to

7    Defendants' motion under the incorporation-by-reference doctrine in considering

8    Defendants' motion to dismiss.[5]  *See Knievel*, 393 F.3d at 1076–77.

9    **B.    Federal Law Issues**

10        Defendants argue three areas of federal law bar Plaintiffs' claims: the

11   Communications Decency Act, First Amendment, and dormant Commerce Clause.  *See*

12   Doc. No. 20-1 at 26–35.  The Court considers each federal law issue in turn.

13        *1.    Communications Decency Act*

14        Defendants first assert that section 230 of the Communications Decency Act

15   ("CDA") provides Defendants with immunity from liability because their website

16   responds to a user search result and only publishes the information from a third party.

17   Doc. No. 20-1 at 26–27.  Plaintiffs argue in opposition that Defendants are responsible

18   either in whole or in part for creating and developing the content on the Website, so they

19   cannot be immune from liability under the CDA.  Doc. No. 23 at 25.

20        The CDA provides website operators immunity "from liability for third-party

21   information (or content . . .) unless the website operator 'is responsible, in whole or in

22   part, for the creation or development of [the] information.'"  *Dyroff v. Ultimate Software*

23   *Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019) (quoting 47 U.S.C. §§ 230(c)(1) &

24

25

26   _____

     [5] The Court also notes that Plaintiffs provide in a footnote that the exhibit attached to their opposition "is
27   unquestionably subject to judicial notice."  Doc. No. 23 at 28 n.6.  However, "[r]equests for judicial
     notice must be made via a separately filed *request* for judicial notice."  *Innovative Sports Mgmt. v.*
28   *Portocarrero*, No. 19-08726 TJH (PLAx), 2021 WL 2497925, at *2 (C.D. Cal. Apr. 6, 2021) (emphasis
     added) (citing *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 570 (1st Cir. 2004)).

(f)(3)).  The CDA specifically directs that "[n]o provider or user of an interactive computer services shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  However, the statute does not provide broad immunity such that "every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part.'"  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, Inc.*, 521 F.3d 1157, 1171 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3)).  "The text of the CDA is 'clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content.'"  *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)).  As the Ninth Circuit expressed, Congress intended to "immunize the *removal* of user-generated content, not the *creation* of content."[6]  *Roommates*, 521 F.3d at 1163 ("In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete."); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) ("The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006))).

---

[6] The Ninth Circuit has provided extensive guidance on CDA immunity as it pertains to various defendants.  *See, e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1031–35 (9th Cir. 2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–25 (9th Cir. 2003); *Roommates*, 521 F.3d at 1162–75; *Barnes*, 570 F.3d at 1099–1105; *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850–53 (9th Cir. 2016); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268–71 (9th Cir. 2016); *HomeAway*, 918 F.3d at 681–84; *Dyroff*, 934 F.3d at 1097–99; *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090–94 (9th Cir. 2021); *Gonzalez v. Google LLC*, 2 F.4th 871, 890–97 (9th Cir. 2021).

The Ninth Circuit created a three-prong test to determine whether a website operator is immune from liability under the CDA. *See Barnes*, 570 F.3d at 1100–01. The test provides immunity from liability for "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id.*

The question here is whether the CDA immunizes Defendants' from being held liable for Plaintiffs' claims that they violated California's and Alabama's right of publicity statutes by displaying Plaintiffs' names and corresponding information as a "teaser" to sell subscriptions to access their database. *See, e.g.*, *Roommates*, 521 F.3d at 1161–62, 1165; *Dyroff*, 934 F.3d at 1098. The Court finds that Defendants do not have immunity under the CDA.

### a.   Interactive Computer Service Provider

As to the first element, "interactive computer service" is defined under the CDA as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). The Ninth Circuit "interprets the term 'interactive computer service' expansively." *Dyroff*, 934 F.3d at 1097 (citing *Kimzey*, 836 F.3d at 1268); *Carafano*, 339 F.3d at 1123. As further noted by the Ninth Circuit, "the most common interactive computer services are websites." *Roommates*, 521 F.3d at 1162 n.6.

Here, it is clear Defendants are an interactive computer service provider as defined in 47 U.S.C. § 230(f). Defendants briefly contend that Defendant Instant Checkmate "owns a website accessible to millions and is a provider of an interactive computer service." Doc. No. 20-1 at 26. Plaintiffs do not argue otherwise. *See generally* Doc. No. 23. For one, "Instant Checkmate" is a website. Even more so, millions of users could set up an account on the Website, which Defendants operate, own, and created, to acquire

"access to a database containing proprietary 'detailed reports' about people to anybody willing to pay for a monthly subscription."  Compl. ¶ 1; *see Dyroff*, 934 F.3d at 1097; *Lemmon*, 995 F.3d at 1091; *Kimzey*, 836 F.3d at 1268.  Therefore, Defendants' website meets the definition of "interactive computer service" under the CDA.  The first prong of the test is satisfied.

> ### b.   Treatment As a Publisher or Speaker of Another's Content

As to the second element, the Court must consider "whether the [plaintiff] treats the [defendant] as a 'publisher or speaker' in a manner that is barred by the CDA." *HomeAway*, 918 F.3d at 681.  The Ninth Circuit has provided direction as to what is a "publication" and a "publisher" as the words pertain to the three-prong test. "Publication" is defined "in this context [as] to 'involve reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.'"  *Id.* 682 (quoting *Barnes*, 570 F.3d at 1100–01).  A "publisher" in turn "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it."  *Barnes*, 570 F.3d at 1102.

Here, the second element turns on whether Plaintiffs, in their right of publicity claims, seek to treat Defendants as a "publisher or speaker" of the personal information used in advertisements in order to hold Defendants liable.  After a review of the Complaint, the Court finds that Plaintiffs seek treatment of Defendants as a publisher. Defendants' theory as to the second element rests on the assertion that Plaintiffs are attacking Defendants' "distribution of content" and "the way in which [Defendants] display[] information on its website," and thus Plaintiffs treat Defendants as "publishers." Doc. No. 20-1 at 27.  Plaintiffs contend in opposition, without directly addressing whether they seek to treat Defendants as publishers, that the "case is not about the legality of third-party content housed in Defendants' databases; it is about the legality of free preview ads *created* by Defendants."  Doc. No. 23 at 27.

The Ninth Circuit has instructed that the type of cause of action does not matter, but "what matters is whether the cause of action inherently requires the court to treat the

defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101–02; *see also Gonzalez*, 2 F.4th at 891 ("What matters when we assess this element is 'whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another.' . . . This element is satisfied when 'the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker."'" (citation omitted) (quoting *Barnes*, 570 F.3d at 1102)); *Lemmon*, 995 F.3d at 1092 (providing, in a negligent design cause of action case, that "the duty [defendant] allegedly violated 'springs from' its distinct capacity as a product designer'" and is not related to its "editing, monitoring, or removing of the content that users generate through Snapchat"). The Ninth Circuit further explained that "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102; *Lemmon*, 995 F.3d at 1091 ("[R]egardless of the type of claim brought, we focus on whether 'the duty the plaintiff alleges' stems 'from the defendant's status or conduct as a publisher or speaker.'" (quoting *Barnes*, 570 F.3d at 1107)).

In the present action, Plaintiffs allege right of publicity causes of action, whereby they are challenging whether Defendants used their "likeness" without their consent to promote Defendants' services.[7] The issue is thus whether Defendants' use of Plaintiffs' information and identity violates California or Alabama law. Essentially, Plaintiffs' alleged violations seek to hold Defendants liable as publishers of the information it uses for advertisements. *E.g.*, Compl. ¶¶ 2 ("[Defendants] use their identities to sell subscriptions."); 4 ("Defendants knowingly search for and obtain identifying information on Alabama and California residents."); 5 ("Defendants compile and generate the content they advertise and sell on their websites."); 23 ("[Defendant TCG] created and controls

---

[7] The disputed elements and precedent surrounding each right of publicity statute will be considered *infra* Section IV.C.

the marketing and advertising of all the People Search Websites, including the Marketing Page solicitations at issue in this case."); 47 ("[T]o promote those reports, Defendants used and/or use Plaintiff Camacho's and the putative Alabama class members' identities on their various Marketing Pages. . . ."); 56 (same). Because Plaintiffs' right of publicity claims seek to impose liability for Defendants' use of their identities in creating advertisements on the Website, Plaintiffs seek to treat Defendants as a publisher. Plaintiffs' claims are "directed against [Defendants] in [their] capacity as a publisher or speaker." *Kimzey*, 836 F.3d at 1268. Therefore, the second prong is satisfied.

### c.   Publication of Content/Information Provided by Another Information Content Provider

As to the third element, Section 230 "cuts off liability only when a plaintiff's claims faults the defendant for information provided by third parties." *Lemmon*, 995 F.3d at 1093 (citing 47 U.S.C. § 230(c)(1)); *Barnes*, 570 F.3d at 1101. A defendant may also be liable if they are "'responsible' . . . in part, for the creation or development of' the offending content" on the website. *Roommates*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(c)(1)). The Ninth Circuit has clearly acknowledged that CDA immunity does not extend to "content created or developed by an interactive computer service." *Kimzey*, 836 F.3d at 1269. Here, the Court must consider whether Defendants published content that they did not create or develop, in whole or in part, such that they would be immune under Section 230.

Under the CDA, "information content provider" is defined as "any person or entity that is responsible, in whole *or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3) (emphasis added). With enactment of Section 230, "Congress affirmatively immunized interactive computer service providers that publish the speech or content of others." *Gonzalez*, 2 F.4th at 898. The Ninth Circuit explains "a website that 'creat[es] or develop[s]' content 'by making a material contribution to [its] creation or development' loses § 230 immunity." *Id.* at 892 (quoting *Kimzey*, 836 F.3d at 1269). *But*

*see Sessa v. Ancestry.com Operations Inc.*, 561 F. Supp. 3d 1008, 1017 (D. Nev. 2021) ("[W]hile the yearbook publishers originated the content that Ancestry used to create its database, and the yearbooks were provided by third parties, Ancestry alone is responsible for posting the material on its website after it receives the records from others.  Section 230 immunity therefore does not attach."), *appeal docketed*, No. 21-1668 (9th Cir. Oct. 1, 2021).  A "material contribution" does not merely refer to "augmenting the content generally, but to materially contributing to its alleged unlawfulness.  In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Roommates*, 521 F.3d at 1168.  The "material contribution" test "draw[s] the line at the 'crucial distinction between, on the one hand, taking actions . . . that are necessary to display . . . actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable.'" *Kimzey*, 836 F.3d at 1269 n.4 (quoting *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 413–14 (6th Cir. 2014)).  As the Ninth Circuit notes, "[o]ther circuits have adopted this 'material contribution' test, acknowledging that making a material contribution does not mean 'merely taking action that is necessary to the display of the allegedly illegal content,' but rather, 'being responsible for what makes the displayed content allegedly unlawful.'" *Gonzalez*, 2 F.4th at 892 (first quoting *Dirty World Entm't*, 755 F.3d at 410; then citing *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 176 (2d Cir. 2016); then citing *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014); then citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 257–58 (4th Cir. 2009); and then citing *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197–1201 (10th Cir. 2009)).

The Ninth Circuit explicitly stated its case law "makes clear that an entity that does not materially contribute to *the alleged unlawfulness of the content* is neither a creator nor a developer for the purposes of § 230(f)(3)." *Gonzalez*, 2 F.4th at 893 (emphasis added); *see also Carafano*, 339 F.3d at 1121–22 (holding that a website was not a creator or developer of content on its dating website by providing neutral tools that were designed

to match romantic partners depending on users' voluntary contributions but providing that a website could be a content developer if it encouraged users to provide illegal content on the website); *Batzel*, 333 F.3d at 1031 (explaining that in order to develop information, there must be "something more substantial than merely editing portions of an e-mail and selecting material for publication"); *Kimzey*, 836 F.3d at 1270 (concluding that a website that allows users to input business reviews or ratings did not use "anything other than user-generated data" and providing that the "star-rating system" is exactly the type of "neutral tool" that does "not amount to content development or creation"). Simply providing "neutral means by which third parties can post information of their own independent choosing online" does not make a website a creator or developer of content. *Kimzey*, 836 F.3d at 1270. In *Roommates*, the Ninth Circuit held that "the website—by requiring users to disclose their sex, sexual orientation, whether they had children, and the traits they preferred in their roommate—was designed to encourage users to post content that violated fair housing laws." *Gonzalez*, 2 F.4th at 894 (citing *Roommates*, 521 F.3d at 1161, 1164–66). As the court explained, the website in *Roommates* became more than a "passive transmitter" and instead became a developer, or at least in part, of the information on the website. *Roommates*, 521 F.3d at 1166.

In a recent Northern District of California case involving a "people search" website, the court addressed the very issue at play in the present action:

> Spokeo [the defendant] is not alleged to merely host *user-generated* content, it is alleged to actively take content from other sources, curate it, and upload it to its site in a novel configuration for repurposed uses. This makes it at least "in part" responsible for the "creation and development" of this material. Indeed, the allegations are that there are no users of Spokeo who *generate* content at all. That is why several other district courts have rejected CDA immunity for analogous services.

*Kellman v. Spokeo, Inc.*, No. 3:21-cv-08976-WHO, 2022 WL 1157500, at *13 (N.D. Cal. Apr. 19, 2022) (citing *Roommates*, 521 F.3d at 1162). This analysis is akin to the outcome other courts have reached as to similar websites. *See, e.g.*, *Boshears v.*

*PeopleConnect, Inc.*, No. C21-1222 MJP, 2022 WL 888300, at *11–12 (W.D. Wash. Mar. 25, 2022) ("The Court finds that [the defendant] is not entitled to protection under the CDA.  The sole issue in this case is whether [the defendant's] decision to create advertisements using [the plaintiff's] persona to sell subscription services violates the [Indiana Right of Publicity Act] and the common law.  That content is generated expressly by [the defendant] and the advertisement is not merely a passive display of content created by another entity, even if it contains a picture from a school yearbook. In this context, [the defendant] is the content creator and is not entitled to immunity under the CDA."), *appeal docketed*, No. 22-35262 (9th Cir. Mar. 28, 2022); *Bonilla v. Ancestry.com Operations Inc.*, No. 20-C-07390, 2021 WL 5795306, at *4 (N.D. Ill. Dec. 7, 2021) ("Plaintiff's complaint includes allegations that [the defendant] created records of Plaintiffs reflecting the information from the yearbook record, and uses that information to entice potential customers to subscribe to its services. . . . Th[e] allegations, taken as true, do not establish that [the defendant] is a 'passive conduit' that should receive immunity under the CDA."); *Lukis v. Whitepages Inc.* (*Lukis I*), 454 F. Supp. 3d 746, 763 (N.D. Ill. 2020) ("Whitepages did not act as a mere passive transmitter or publisher of information that was 'provided by another information content provider.' Rather, it is alleged to have actively compiled and collated, from several sources, information regarding Lukis.  The CDA therefore does not shield Whitepages from liability." (citations omitted)); *Krause v. RocketReach, LLC*, 561 F. Supp. 3d 778, 785 (N.D. Ill. 2021) ("While it may be, as defendant contends . . . that the information in defendant's database is exclusively provided by 'another information content provider,' the complaint alleges that defendant curated that information for commercial gain and used plaintiff's and the class members' identities to do so.  These allegations, on their face, do not establish that the Communications Decency Act shields defendants from liability."); *Brown v. Intelius, Inc.*, No. 4:12CV00852 AGF, 2012 WL 5878230, at *4 (E.D. Mo. Nov. 21, 2012) (holding that a defendant website, which provided information about other people to a user who subscribed to the website, was not immune under the

CDA because "[e]ven assuming that Defendant is an ISP, Plaintiff is not seeking to hold Defendant liable for the statements of others"); *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC, 2021 WL 3621837, at *13 (N.D. Cal. Aug. 16, 2021) (holding that there was no immunity for a company that was responsible for, in whole or in part, creating "dossiers from data contained in third-party content"); *Kolebuck-Utz v. Whitepages Inc.*, No. C21-0053-JCC, 2021 WL 1575219, at *3 (W.D. Wash. Apr. 22, 2021) ("Plaintiff's complaint alleges Defendant *does*, in fact, generate content. At this stage the Court must accept the allegations in Plaintiff's complaint as true. Defendant's argument does not provide a basis for dismissal of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)." (citations omitted) (citing *Twombly*, 550 U.S. at 555)).

Here, Defendants assert that the third element is satisfied because Instant Checkmate "does not—and cannot—create the biographical information such as a person's name, age, location, and family members, that is displayed on the search results page." Doc. No. 20-1 at 27. Defendants further argue Instant Checkmate "responds to a user's voluntary search inquiry that informs them about the information the user wishes to see." *Id.* at 28. In opposition, Plaintiffs argue that Defendants do not have immunity under the CDA because they are responsible, either in whole or in part, for "creating or developing the free preview ads" that Defendants created. Doc. No. 23 at 25, 27. Plaintiffs further their point by contending that "the ads' unlawfulness stems from Defendants' creation and publishing of the ads themselves" and "Defendants made a 'material contribution' to what makes the ads illegal—by using identifying information to advertise their subscriptions." *Id.* at 26–27. The case, Plaintiffs argue, is thus "about the legality of free preview ads *created* by Defendants." *Id.* at 27. Defendants reply that "the alleged ads are generated only because third parties input search terms like age and name." Doc. No. 24 at 14.

Defendants argue the Website is akin to the website in *Gonzalez*, where the Ninth Circuit found a defendant that operated a "global online service" website was immune

from liability because "a user's voluntary actions inform Google about the user's preferences for the types of videos and advertisements the user would like to see." *Gonzalez*, 2 F.4th at 881, 895.  The Ninth Circuit in *Gonzalez* further found that it was the defendant's "algorithms [that] select the particular content provided to a user based on that user's inputs." *Id.*  However, Defendants' argument that this case is similar to the website in *Gonzalez* is unavailing.  In *Gonzalez*, the website involved is "a[n] online service used to post, share, view, and comment on videos related to a vast range of topics. Users can post content directly on YouTube [the website at issue that is owned by Google]." *Id.* at 881.  The plaintiffs in *Gonzalez* "allege[d] Google uses computer algorithms to match and suggest content to users based upon their viewing history." *Id.*

Moreover, in *Gonzalez*, the plaintiffs alleged that the content originally found on the webpage was created by different users, third parties, and Google in turn used algorithms to select content to present to users based on the users' inputs.  In the present action, Plaintiffs allege that Defendants compiled and gathered content for use on the Website as "teasers," and the Court must accept these allegations as true at this stage of the proceedings.  Plaintiffs also allege that the content on the Website is compiled and generated by Defendants such that Defendants "knowingly search for and obtain identifying information" about people to put on the Website.  Compl. ¶¶ 4–5.  Even if Defendants' algorithms could be considered "passive actions," the key fact is that the Complaint alleges Defendants are gathering the data from other sources and curating it to place on their website.  This action is thus not similar to the website in *Gonzlaez*, where the complaint simply alleged that the defendant's involvement came in the form of an algorithm that selected content from its database to users.  Here the *original content Defendants draw from* for their advertisements, even if that is in response to a user's search input and a subsequent algorithmic response, is problematic.  As alleged in the Complaint, the information provided in Defendants' "teasers" is not uploaded directly by third party users, rather the content is compiled and generated by Defendants.  *See* Compl. ¶¶ 4–5.  In fact, the allegations are such that no Website user generates any

content.  As such, Defendants are at least responsible "in part" for creation or development of the content on the website, specifically the "teasers."  Thus, Defendants fall on the side of having "materially contributed" to the website's content such that they are responsible for the display of the alleged actionable content.  *See Kimzey*, 836 F.3d at 1269 n.4.

Further, in *Lemmon v. Snap, Inc.*, the Ninth Circuit considered CDA immunity as it applied to a "social media platform that allows users to take photos or videos . . . and share them with other [users]."  *Lemmon*, 995 F.3d at 1088.  The plaintiffs in the case filed a lawsuit against the defendant company bringing a negligent design claim, to which the defendant moved to dismiss the case in part because it was immune pursuant to the CDA.  *Id.* at 1090.  The court found that the CDA did not shield the defendant from liability and reasoned that the claim for negligent design "does not turn on the content of" the user's post or message, instead the case turned on the defendant's design of the platform.  *Id.* at 1094.  Similar to the case in *Lemmon*, the basis of the present case is not whether the third-party content Defendants found is itself subject to violation of the California and Alabama right of publicity statutes, but whether Defendants' compilation of the information and their use on the website in the form of "teasers" to promote subscription services is a violation of the right of publicity statutes.  As the Ninth Circuit clarified, "[w]hat matters . . . is 'whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another.'"  *Gonzalez*, 2 F.4th at 891 (quoting *Barnes*, 570 F.3d at 1102)).  That is not the case here.  Defendants' alleged actions in compiling and using Plaintiffs' and other's information without consent is what is alleged to be illegal or actionable.  Essentially, Defendants are being sued for allegedly gathering information about Plaintiffs, and others, without their consent and displaying it on the Website to promote a subscription service.  Defendants produced the offending content, and the "teaser" is not just content passively displayed by another party.  It is Defendants' alleged use and display of Plaintiffs' and other's information that is at issue in the case.  The CDA cannot shield Defendants from liability

for such claims.  The third element has not been satisfied, and the CDA does not provide Defendants with immunity.

Therefore, the Court **DENIES** Defendants' motion on this basis.

2.    *First Amendment*

Defendants next argue the First Amendment bars Plaintiffs' claims because Plaintiffs' application of the state right of publicity statutes attacks Defendants' "constitutionally protected speech."  Doc. No. 20-1 at 28.

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The First Amendment applies to the States through the Fourteenth Amendment.  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976). The First Amendment "protects commercial speech from unwarranted governmental regulation."  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).  Commercial speech "not only serves the economic interest of the speaker, but also assist[s] consumers and furthers the societal interests in the fullest possible dissemination of information."  *Id.* at 561–62.  As such, the Supreme Court has rejected the "view that the government has complete power to suppress or regulate commercial speech."  *Id.* at 562.  Different types of speech are afforded varying levels of protection.  *Id.* at 562–63.  Commercial speech is provided lesser protection than other constitutionally guaranteed speech.  *Id.* at 563.

a.    Commercial Speech

The parties first take issue with whether the teasers are considered core First Amendment speech or commercial speech.  *See* Doc. No. 20-1 at 28; Doc. No. 23 at 27. Defendants argue the speech does more than "propose a commercial transaction" and is not commercial speech.  Doc. No. 20-1 at 29.  Plaintiffs assert Defendants' conduct amounts to commercial speech.  Doc. No. 23 at 28.

The Supreme Court has recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 64 (1983). The Supreme Court has stated that "[t]he Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 562–63 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). The essential feature of commercial speech is that it does "no more than propose a commercial transaction." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) (acknowledging that the appropriate "test for identifying commercial speech" is proposal of a commercial transaction test); *see also Titan Sports, Inc. v. 3-G Prods.*, No. CV 90-3022-RJK, 1991 WL 228716, at *2 (C.D. Cal. July 31, 1991) ("Commercial speech is an expression related solely to the economic interests of the speaker and its audience."). It has also "made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger*, 463 U.S. at 68 (quoting *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 563 n.5). The Ninth Circuit has elaborated that "[w]here the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). However, the Ninth Circuit in *Hunt* noted that "[c]ommercial speech does not retain its commercial character 'when it is inextricably intertwined with otherwise fully protected speech.'" *Id.* (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)).

Here, the speech at issue is commercial speech. Defendants argue the "teasers" are not commercial speech because they do not propose a commercial transaction as they

provide users with "a free search of biographical 'information' and by informing users about background reports that [Instant Checkmate] has available." Doc. No. 20-1 at 29 (citation omitted). This argument is unpersuasive. At a minimum, Plaintiffs are not challenging the reports on the Website. Instead, Plaintiffs' name, identifying information, and likeness is alleged to be used by Defendants for the purpose of enticing users into subscribing to Defendants' services. Plaintiffs are not challenging the use of their likeness on the entire Website itself, but rather they seek to prevent use of their likeness in conjunction with advertisements for Defendants' services. Compl. ¶¶ 2, 28; Doc. No. 23 at 28 ("Plaintiffs challenge the use of their identifying information in Defendants' advertising for those subscriptions—*not* the inclusion of their information in a directory."). This is commercial speech.

Defendants do not identify any cases that would induce the Court to reach a different conclusion. *See, e.g.*, Doc. No. 20-1 at 29–30 (first citing *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1121–22 (9th Cir. 2020) (providing that IMDb.com used "free, publicly available profiles" with content that the court found was "encyclopedic, not transaction" and thus the profiles did not "propose a commercial transaction"); then citing *Nieman v. VersusLaw, Inc.*, 512 F. App'x 635, 638 (7th Cir. 2013) (concerning legal documents and other judicial record documents used on the defendant's website, in which the profiles were protected by the First Amendment as "[o]ther legal documents included by the court as part of the public record of the judicial proceedings are also covered by the First Amendment privilege"); then citing *Doe v. Oesterblad*, No. EDCV 13-0514 JGB (DTBx), 2013 WL 12085541, at *4 (C.D. Cal. May 9, 2013) (finding that the defendants had "shown that these defenses[, including a First Amendment defense,] bar Plaintiffs from demonstrating, at this stage of the litigation, that they are likely to succeed on the merits of their right of publicity claim" that pertains to a website that "listed the names and photographs of the John Doe Plaintiffs and identified them as sex offenders"); then citing *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384, 1389 (N.D. Ill. Sept. 12, 2016) (holding that the defendant's publications were protected by the First Amendment for a

website that "promotes certain legal services, and publishes a directory of attorneys in the United States," which is essentially "truthful newsworthy information about individuals such as teachers, directors and other professionals, such as a newspaper or yellow page directory"); then citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) (concerning court proceedings notes that were televised, which the Court found to be protected by the First Amendment); and then citing *Ostergren v. Cuccinelli*, 615 F.3d 263, 286–87 (4th Cir. 2010) (discussing constitutionality of a state privacy law as it pertains to social security numbers contained in publicly available land records that had not been redacted by the clerks of court)).  The Court additionally finds that no facts have been presented to show Defendants' "teasers" that allegedly use Plaintiffs' identifying information to promote its services are intertwined with "otherwise fully protected speech."  *Hunt*, 638 F.3d at 715 (quoting *Riley*, 487 U.S. at 796).

Moreover, similar to the pamphlets at issue in *Bolger v. Youngs Drug Products Corp.*, the combination of the "teasers'" characteristics indicate that they are characterized as commercial speech.  *Bolger*, 463 U.S. at 67.  Defendants' teasers are advertisements, concern a specific product they sell, and are presented to users because of an economic motivation.  *See id.* at 66–67.  As such, these characteristics in their totality "provide[] strong support" for the conclusion that the teasers should be characterized as commercial speech.  *Id.* at 67.

In sum, the subject of the present case concerns Defendants' teasers—not Defendants' Website.  These teasers are unquestionably advertisements that "are aimed only at inducing a commercial transaction, not about the meaningful communication of knowledge."  *Kellman*, 2022 WL 1157500, at *15.  This same outcome was reached in other cases involving analogous services and First Amendment challenges.  *See id. Boshears*, 2022 WL 888300, at *10; *see also Lukis v. Whitepages Inc.* (*Lukis II*), 542 F. Supp. 3d 831, 843–44 (N.D. Ill. 2020); *Kolebuck-Utz*, 2021 WL 1575219, at *3.  Thus, the teasers qualify as commercial speech.

b.    Constitutionality

The Court, having determined that the speech at issue is commercial, must now consider whether California's and Alabama's right of publicity statutes violate the First Amendment.  *See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 562–63.

The Supreme Court has provided that "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial government interest and only through means that directly advance that interest." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) (citing *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566).  Whether commercial speech is protected thus "turns on the nature of both the expression and of the governmental interests served by its regulation." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 563.  Accordingly, the Supreme Court developed a four-step analysis for commercial speech.  *Id.* at 566.  First, the court "must determine whether the expression is protected by the First Amendment." *Id.*  Basically, the speech will fall within the provision if it at least "concern[s] lawful activity and [is not] misleading." *Id.*  Second, the court must consider "whether the asserted governmental interest is substantial." *Id.*  Then, if the first two factors are met in the affirmative then the court determines "whether the regulation directly advances the governmental interest asserted, and whether it is more extensive than is necessary to serve that interest." *Id.*

Here, Defendants' argument that Plaintiffs' claims attack Defendants' First Amendment rights is unsuccessful.  As to the first question the Court must consider, it is seemingly questionable whether the commercial speech that is the subject of this action is even entitled to any protection at all given that the profiles could "misappropriate" Plaintiffs' personas and possibly cause the public to be misled.  Regardless of how the first consideration is decided, the states' statutes advance substantial state interests.  Defendants argue "Alabama and California have no substantial interest in censoring biographical information compiled from 'public records.'" Doc. No. 20-1 at 31.  The Court disagrees.  To say that states have *no* substantial interest in preventing non-

consensual commercial use of another's information just because the information is from the public record is unconvincing.  As another court provided, "[l]aws governing the right to publicity have a substantial interest in regulating commercial speech.  Individuals have a property right in their own identity. . . .  The right to publicity prevents others from depleting the economic value of one's persona without internalizing the costs." *Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 929 (N.D. Ohio 2004).  "The protection of privacy interests is . . . a longstanding commitment of the law—and an important one." *Kellman*, 2022 WL 1157500, at *15 (citing *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)).  Thus, the statutes advance both states' substantial interest in protecting its citizens from non-consensual commercial use of another's information—both arguably property and privacy interests.

Further, the states' interests in protecting its citizens from non-consensual commercial exploitation of their personas is substantial and not overbroad so as to prohibit commercial speech.  Both state laws provide broad exemptions related to newsworthiness and matters of public affairs or interest, which are fundamental First Amendment principles.  And in any event, "the Supreme Court has expressly held that imposing liability for violating the traditional publicity right does not necessarily offend the First Amendment." *Kellman*, 2022 WL 1157500, at *15 (citing *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575–77 (1977)).  Thus, both statutes comport with the First Amendment and Plaintiffs' claims do not violate it, which is, again, a similar finding many other courts have made concerning similar speech. *See, e.g.*, *Kellman*, 2022 WL 1157500, at *15; *Bosley*, 310 F. Supp. 2d at 929.

Accordingly, the Court **DENIES** the motion on this basis.

### 3. Dormant Commerce Clause

Finally, Defendants argue Plaintiffs' theory of liability violates the dormant Commerce Clause.  Doc. No. 20-1 at 32.  Defendants assert that "Plaintiffs proposed applications of ARPA and § 3344 . . . are *per se* violations of the Dormant Commerce Clause because they seek to regulate *conduct*—the publication of Plaintiffs' information

to users viewing electronic devices—occurring *outside* Alabama or California." *Id.* Defendants further contend that "even if Plaintiffs had alleged the conduct occurred in Alabama or California," the state statutes violate the dormant Commerce Clause because they burden interstate commerce. *Id.* Defendants allege that the state interest in this case is "de minimis" or "negligible" and "is far outweighed by the burden on interstate commerce of applying ARPA or § 3344." *Id.* at 32–33. In opposition, Plaintiffs assert that Defendants' dormant Commerce Clause argument is premature and fails on the merits because Alabama's and California's right of publicity statutes "do not represent 'negligent' state interests." Doc. No. 23 at 30. Plaintiffs explain that they "seek to hold Defendants accountable for their conduct based in those states," instead of seeking to apply the statutes to commerce that occurs wholly outside of those states. *Id.* Their analysis follows that Defendants' argument would mean that states would be prevented "from ever regulating any conduct that occurs on the Internet." *Id.* at 31. The burden of adjusting their advertising scheme to comply with state laws, Plaintiffs argue, would be minor. *Id.* Defendants in reply provide that Defendants "merely seek[] to prevent *Plaintiffs* from barring conduct (i.e., publication of information) that occurs entirely *outside* Alabama or California and is not directed to those states." Doc. No. 24 at 14–15. The net effect of Plaintiffs' approach, Defendants argue, "would be harmful because the out-of-state burdens far outweigh the supposed benefits." *Id.* at 15.

The Constitution provides in the Commerce Clause that Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States." Const. art. I, § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979). In other words, states cannot discriminate against, or place unduly burdens on out of state commerce. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018). "This limitation on state power has come to be known as the dormant

Commerce Clause." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147–48 (9th Cir. 2012); *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008).

The dormant Commerce Clause "is driven by concern about 'economic protectionism that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky.*, 553 U.S. at 337–38 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 180 (1988)); *see also Dennis v. Higgins*, 498 U.S. 439, 446 (1991) ("[T]he Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980))). With this purpose in mind, "it is not surprising that a state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." *Harris*, 682 F.3d at 1148 (citing *S. Pac. Co. v. State of Arizona*, 325 U.S. 761, 767 (1945)). However, the Supreme Court has held that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976); *see also Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443–44 (1960) (providing that the Constitution "never intended to cut States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country"). As such, when alleging a dormant Commerce Clause violation, it is necessary to show that the law imposes a *substantial burden* on interstate commerce. *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

The Supreme Court has adopted a two-tiered approach in determining whether a law runs afoul of the Commerce Clause. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578 (1986) [hereinafter *Brown*]. First, a state statute may be struck down if it "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interest over out-of-state interests." *Id.* at 579; *see Harris*, 682 F.3d at 1148 ("Most regulations that run afoul of the dormant Commerce Clause do so because of discrimination.") (citing *GMC v. Tracy*, 519 U.S.

278, 298 n.12 (1997))).  Second, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (emphasis added); *see Brown*, 476 U.S. at 579; *see Harris*, 682 F.3d at 1148 ("[I]n a small number of dormant Commerce Clause cases[,] courts also have invalidated statutes that imposed other significant burdens on interstate commerce." (citing *Tracy*, 519 U.S. at 298 n.12)).  Thus, "[i]f a legitimate local purpose is found, the question becomes one of degree."  *Pike*, 397 U.S. at 142.  The inquiry thus turns on the "nature of the local interest involved" and "whether it could be promoted as well with a lesser impact on interstate activities."  *Id.*  Consequently, "[i]f a regulation merely has an effect on interstate commerce, but does not impose a significant burden on interstate commerce, it follows that there cannot be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike*."  *Harris*, 682 F.3d at 1155.  In *Exxon Corp. v. Governor of Maryland*, once the Supreme Court "determined that there was no discrimination and no significant burden on interstate commerce, it ended its dormant Commerce Clause analysis without assessing the value of the statute's purported benefits or actual benefits."  *Id.* (citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–29 (1978)).

Here, Plaintiffs' theory of liability and the application of the states' statutes do not run afoul of the dormant Commerce Clause.  Defendants appear to only argue that the statutes regulate out-of-state conduct, and not that it discriminates against it, and that the states' "negligible" interests are substantially outweighed by the burden on interstate commerce.  *See* Doc. No. 20-1 at 32–33.  However, this is simply not a case where the states' statutes *preclude* economic activity or *directly control* commerce that occurs *wholly* outside of California or Alabama.  *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  Defendants are, in essence, arguing that they "will have to follow different states' laws about what it can and cannot show to users."  *Kellman*, 2022 WL 1157500, at

*14.  This argument is ineffective.  As to the first factor, the statute does not seem to regulate or discriminate against interstate commerce or favor in state economic interests.  The law applies evenly.  As to the second factor, the burden is not excessive.

Further, Defendants fail to demonstrate how the laws were devised as economic barriers favoring California and Alabama economic interests.  Further, the Court finds Defendants present no compelling argument that a sufficient burden outweighs any purported benefit.  Defendants merely state that the states' interests are "negligible" as compared to the burden on interstate commerce but do not paint a picture of why such a burden would be "clearly excessive" of California's and Alabama's interests in thwarting any use of its residents' personas without their consent.  As two other courts that have noted in rejecting dormant Commerce Clause arguments in cases involving similar services:

> [The defendant] fails to offer any convincing rationale why the burden imposed on its interstate business is clearly excessive in light of [the state's] desire to prevent non-consensual commercial use of [the state's] personas. The burden on [the defendant] itself is incidental to the Right of Publicity Law's attempt to protect [each state's residents'] property interest in their own persona.  This protective measure serves the core, individual rights of [residents'] and [the defendant] provides no evidence the law was designed as an economic barrier to favor [the state's] economic interests.  Nor has [the defendant] shown that there is some less burdensome approach that could satisfy [the state's] interests as to publicity rights.

*Kellman*, 2022 WL 1157500, at *14 (quoting *Knapke*, 553 F. Supp. 3d at 881).  Like the other courts' findings, Defendants fail to present any convincing rationale as to why the burden imposed on out-of-state business is "clearly excessive" given California's and Alabama's desire to restrict commercial use of its residents' personas without consent.  Defendants fail to show how the purported burden, which could be nothing more than merely incidental to the states' efforts to protect its residents, even comes close to reaching a level of being "clearly excessive."  The Court additionally notes that,

unsurprisingly, Defendants "cannot point to a single case that held that any similar law ran afoul of the dormant Commerce Clause." *Kellman*, 2022 WL 1157500, at *14.

Accordingly, the Court **DENIES** Defendants' motion to dismiss as to this basis.

### 4.   Conclusion

The Court **DENIES** Defendants' motion to dismiss Plaintiffs' claims on the bases that the CDA, First Amendment, and dormant Commerce Clause bar Plaintiffs' claims.

## C.   Prima Facie Claims and Exceptions

Defendants move to dismiss both Plaintiff Cotta's California claim and Plaintiff Camacho's Alabama claim on the ground that they failed to state a claim.  Doc. No. 20-1 at 16, 22.

### 1.   California Claim - Section 3344

Defendants move to dismiss Plaintiff Cotta's California Civil Code Section 3344 ("Section 3344") claim on the ground that Plaintiff Cotta fails to plead a prima facie claim under the statute and a statutory exception bars the claim.  *See id.* at 16–22.

Section 3344 provides in pertinent part:

> Any person who knowingly uses another's name . . . in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ. Code § 3344(a).  Section 3344 also provides a "newsworthiness," or "public interest," exception.  *See id.* § 3344(d).

"California has long recognized a common law right of privacy for the protection of a person's name and likeness against appropriation by others for their advantage." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691 (9th Cir. 1998); *see Miller v. Collectors Universe, Inc.*, 72 Cal. Rptr. 3d 194, 204–05 (Ct. App. 2008) ("The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct

wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community."). "California law provides two vehicles for asserting such a right: a common law cause of action for commercial misappropriation, and a statutory remedy for commercial misappropriation under California Civil Code § 3344." *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 803 (N.D. Cal. 2011). The California common law cause of action has been complemented by the enactment of Section 3344. *Newcombe*, 157 F.3d at 691–92. Section 3344 "neither replaces nor codifies the common law cause of action." *Id.* at 692. To state a common law cause of action for commercial misappropriation, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 347 (Ct. App. 1983). To state a statutory cause of action under Section 3344, a plaintiff must plead the common law elements and additionally establish: "(1) a 'knowing' use; (2) for the purposes of advertising; and (3) a direct connection between the use and the commercial purpose." *Newcombe*, 157 F.3d at 692 (citing *Eastwood*, 198 Cal. Rptr. at 346–47); *see also Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001); *Abdul-Jabbar v. GMC*, 85 F. 3d 407, 414 (9th Cir. 1996) ("We have construed [Section 3344's] protection of 'name, voice, signature, photograph, or likeness' more narrowly than the common law's protection of 'identity.'").

Here, Defendants challenge Plaintiff Cotta's Section 3344 claims on the following grounds: (1) Plaintiff Cotta fails to plead a "use of her identity"; (2) Plaintiff Cotta fails to plead Defendants used her identity for advertising, selling, or soliciting purchases purpose; (3) Plaintiff Cotta consented to use of her identity; (4) Plaintiff Cotta fails to plead an actionable injury; and (5) Plaintiff Cotta's claim is barred by the "public affairs"

exception.[8]  Doc. No. 20-1 at 16–22.  The Court will address each Section 3344 element Defendants challenge Plaintiff Cotta inadequately alleges in turn.

a.  <u>Use of Identity</u>

Defendants first argue, in what appears to be an attack on the first element of Section 3344, that Plaintiff Cotta fails to allege that Defendants "used" her identity.  Doc. No. 20-1 at 16–17.  Defendants assert that Plaintiffs' "Complaint is devoid of any assertion that [Plaintiff] Cotta's information was published to a third party by Defendants," which it argues is required to satisfy the "use element."  *Id.*  Defendants elaborate that "the search results on [the Website] *do not exist* unless a user 'searches for an individual,'" and use of a person's identity that is only viewed by the person themself is not sufficient to state a right of publicity violation.  *Id.* at 17.  Plaintiffs contend in opposition that "Defendants used their names on its publicly accessible website" such that use of Plaintiff Cotta's name satisfies the right of publicity "use" element.  Doc. No. 23 at 17–18.  Plaintiffs elaborate that "[*n*]o internet webpage 'exists' until a user searches for and accesses its content through his or her browsers and, without discovery, it is *impossible* for Plaintiffs to allege to what extent the publicly available webpages displaying their names and identities were served on other users."  *Id.* at 18 (emphasis in original).  Defendants assert in reply that Plaintiff Cotta does not offer any factual basis to show that anyone other than herself or her counsel searched for her names, and the fact that a name could be displayed is not enough to constitute actual display of the name.  Doc. No. 24 at 9–10.

The first element of Section 3344 requires a plaintiff to establish a knowing use of the plaintiff's likeness.  *Newcombe*, 157 F.3d at 692.

Here, Plaintiff Cotta has sufficiently alleged that Defendants "used" her identity.  Plaintiff Cotta alleges in the Complaint that Defendants "used and/or use Plaintiff Cotta's

---

[8] The Court only addresses the disputed elements.

1    and the putative California class members' identities on their various Marketing Pages,

2    which display the individuals found within their records that match the searched name,

3    alongside uniquely identifying information such as each person's current age, location,

4    and names of their immediate family members."  Compl. ¶ 56.  Indeed, Plaintiff Cotta

5    illustrates in the Complaint the alleged use of her identity and likeness by providing a

6    screenshot of what appears to be a search result on the Website for the name "Rhonda L.

7    Cotta."  *See id.* at 7, fig.2.  Furthermore, as Plaintiff points out, *see* Doc. No. 23 at 18,

8    "many court[s] have held that information on readily accessible public websites

9    constitutes public disclosure."  *United States ex rel. Osheroff v. Healthspring, Inc.*, 938 F.

10   Supp. 2d 724, 732–33 (M.D. Tenn. 2013).  As such, Plaintiff Cotta sufficiently pleads the

11   first element of her Section 3344 claim.

                        b.   Commercial Purpose

12

13   Defendants next argue Plaintiff Cotta inadequately pleads use of her identity for a

14   "commercial purpose."  Doc. No. 20-1 at 17.  Defendants assert that Plaintiff Cotta's

15   identity is not used to promote a separate product but rather is part of the product

16   Defendants offer for sale, which forecloses Plaintiff Cotta's claim under Section 3344.

17   *Id.* at 18.  Defendants further argue that "the search results page does not *mention* a

18   subscription, much less promote or offer to sell one" and "users must affirmatively click

19   through more than ten pages before they arrive at any mention of a subscription offer."

20   *Id.* at 19.  Finally, Defendants proffer that "[t]he subscription is the vehicle through

21   which users review the report they selected; it merely allows the user to access other

22   reports *in addition to* that one" such that any "purported report/subscription distinction"

23   does not apply in this case.  *Id.*  In opposition, Plaintiff Cotta defends that Defendants

24   "business model is about selling *subscriptions* to their website and not about selling . . .

25   reports about consumers that can be purchased a la carte."  Doc. No. 23 at 19.  Further,

26   Plaintiffs contend that "even if previews of reports have a direct relation to the consumers

27   they report on, the relation between Plaintiffs and Defendants' subscriptions—which

28   allow access to thousands . . . of data entries about individuals—is negligible."  *Id.*  With

regard to Defendants' argument that the webpage does not mention a subscription, Plaintiff Cotta asserts this argument fails because "users *cannot* purchase reports on searched-for individuals; Defendants' use of Plaintiffs' likeness is *only* intended to funnel users towards subscription purchases." *Id.* at 19–20.  Defendants reply that "[w]hether the reports are sold as a subscription or individually," Plaintiff Cotta's identity is part of the product that Defendants offer for sale and thus is "not used for a commercial purpose."  Doc. No. 24 at 10.  Further, Defendants provide that "the Complaint never alleges that the entire website is an advertisement for [Instant Checkmate] subscriptions . . . and Plaintiffs cannot use their brief to amend their Complaint."  *Id.*

Further, Defendants rely on *Dobrowolski v. Intelius, Inc.*, in which another district court reached a different result in applying Illinois' right of publicity statute to an action involving a "people search" website, and thus the same outcome should be reached in the present case.  *See* Doc. No. 20-1 at 18–19; Doc. No. 24 at 10–11.  Defendants argue that Plaintiff Cotta's identity is "'not used to promote a separate product—they are used because plaintiff[] [is] *part of* the product offered for sale': background reports about Plaintiffs or a subscription that provides access to *their* reports."  Doc. No. 20-1 at 18 (quoting *Dobrowolski v. Intelius, Inc.*, No. 17 CV 1406, 2018 WL 11185289, at *3 (N.D. Ill. May 21, 2018)).  Plaintiff Cotta asserts that this case is dissimilar to *Dobrowolski* and that *Lukis v. Whitepages Inc.*, another Illinois district court case concerning a "people search" website, is instructive on this issue.  Doc. No. 23 at 19.  Plaintiff Cotta elaborates that the defendant in *Dobrowolski* advertised and sold "reports about consumers that can be purchased a la carte," which is not similar to the present case where the product sold is a subscription to use Defendants' entire website.  *Id.*  In reply, Defendants contend that Plaintiff Cotta's "purported distinction between the background reports in *Dobrowolski* and the subscription service here fails because *Dobrowolski* also included an option to purchase unlimited reports."  Doc. No. 24 at 10.  Defendants further provide that because Plaintiff Cotta's identity is part of the product Defendants offer for sale, her identity is not used for a commercial purpose.  *Id.*

Section 3344 requires the plaintiff to plead "use of the plaintiff's name, photograph or likeness for purposes of advertising or solicitation of purchases" and there must be a "direct connection between the use and the commercial purpose." *Eastwood*, 198 Cal. Rptr. at 347. As to this requirement, "[a] review of the cases finding that commercial speech violates the right of publicity strongly suggests that advertisements are actionable when the plaintiff's identity is used, without consent, to promote an *unrelated* product."[9] *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307, 317 (Ct. App. 2001) (first citing *Newcombe*, 157 F.3d at 691–94; then citing *Abdul-Jabbar*, 85 F.3d at 416; then citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1097–98 (9th Cir. 1992), *abrogated by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); then citing *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir. 1992); then citing *Midler v. Ford Motor Co.*, 849 F.2d 460, 461 (9th Cir. 1988); then citing *Reilly v. Rapperswill Corp.*, 377 N.Y.S.2d 488, 489–40 (App. Div. 1975); and then citing *Flores v. Mosler Safe Co.*, 164 N.E.2d 853, 853–54 (N.Y. 1959)).

The *Dobrowolski* case involved class action claims brought under the Illinois Right of Publicity Act and involved "people search" websites. *Dobrowolski*, 2018 WL 11185289, at *1. The court found that the defendants' use of the individuals' personas was not considered "for a commercial purpose" for the following reasons:

> The marketing page lists defendants' reports that are available for purchase, and for each listing there is a preview of the information in the underlying report. The plaintiffs' identities are not used to promote a separate product— they are used because plaintiffs' identities are part of the product offered for sale.

---

[9] The Court notes that *Gionfriddo* addressed the common law right of publicity issues as it relates to the issue of advertisements and commercial speech. *See Gionfriddo*, 114 Cal. Rptr. 2d at 313–17. The Court nonetheless finds this analysis instructive on the issue of advertisements and commercial speech under the present statutory right of publicity claim.

*Id.* at *3.  Essentially, the advertisements' purpose was for purchase of the reports corresponding to the names that a user searched, and the court hung its hat on this reasoning to reach the conclusion that the use was not for a commercial purpose.  *See id.*; *Lukis I*, 454 F. Supp. 3d at 760 ("As the *Dobrowolski* court described it, however, the defendants there used the free previews to advertise only background reports regarding the person identified in the preview. . . .  Given this, the court held that '[t]he plaintiffs' identities are not used to promote a separate product—they are used because plaintiffs' identities are part of the product offered for sale'—and for that reason were not being used for a commercial purpose under Section 30(a)." (quoting *Dobrowolski*, 2018 WL 11185289, at *3)).  The *Lukis* case involved a class action claim brought pursuant to the Illinois Right of Publicity Act and involved "people search" websites.  *Lukis I*, 454 F. Supp. 3d at 750.  As to an analogous "commercial purpose" element under Illinois law, the court reasoned:

> Whitepages used Lukis's identity to advertise not a background report regarding Lukis, but a monthly subscription service giving the purchaser access to background reports on anybody in Whitepages's database. . . .  Thus, Lukis's identity was not part and parcel of the entire product or service being advertised, meaning that Whitepages's use of her identity had a commercial purpose even on Dobrowolski's understanding of Section 30(a).

*Id.* at 760–61.  The *Lukis* court reached its conclusion in light of the *Dobrowolski* holding and the *Dobrowolski* court's understanding of the right of publicity statute.  *Id.* Therefore, the Court agrees with Plaintiff Cotta that the present action is dissimilar to *Dobrowolski* and more akin to *Lukis*.

Here, the issue boils down to whether Plaintiff Cotta sufficiently alleges Defendants use Plaintiff Cotta's identity to promote a product that is separate and different from the entire product or service that Defendants advertise.  The Court finds that they do.  Plaintiff Cotta alleges in the Complaint a user performs a free search of an individual on the Website and then the Website later shows the user, after the search is

entered and the results page is displayed, an "offer to sell them a paid subscription to their services, where they can access detailed reports about *anybody* in their database," which differs from *Dobrowolski*.  Compl. ¶¶ 2, 27 (providing that after a search result is rendered, "Instant Checkmate displays a checkout page with two offers to purchase a subscription to the website: (i) a 'MOST POPULAR' tier costing $35.12 per month with access to one month of unlimited reports and (ii) the 'Power User' tier costing $84.28, with access to three months of unlimited reports").  As alleged, Defendants use Plaintiff Cotta's identity to sell a product that provides the buyer, upon purchasing the subscription, with access to Defendants' entire Website database.  *See Lukis I*, 454 F. Supp. 3d at 760 ("Lukis's identity was not part and parcel of the entire product or service being advertised, meaning that [the defendant's] use of her identity had a commercial purpose even on *Dobrowolski*'s understanding of Section 30(a) [the right of publicity statute].").  The core of the present case concerns Defendants' "teasers," which are not entire profiles, and not the profiles on the Website.  As alleged in the Complaint, use of Plaintiff Cotta's identity in "teasers"—which advertise a subscription service that provides access to unlimited reports—is certainly promotional.  Simply put, "[t]he teaser is not the full profile." *Kellman*, 2022 WL 1157500, at *7.  Rather, the "teasers" intentionally withhold information about the searched-for person with the purpose of attracting a user to subscribe to Defendants' service.  This is surely an adequately alleged commercial purpose that satisfies this element of Section 3344.  The Court finds that Plaintiff Cotta sufficiently alleges that Defendants' use of Plaintiff Cotta's identity is for advertising a separate product.  Thus, at this stage of the proceedings, Plaintiff Cotta has adequately alleged commercial exploitation to satisfy the test at this stage.[10]  *Cf. Callahan v. PeopleConnect* (*Callahan II*), No. 20-cv-09203-EMC, 2021 WL 5050079, at

---

[10] The Court acknowledges that the evidence to come may show that a different result on this element—and any other Section 3344 element—is warranted, but for now under Rule 12(b)(6) standards, Plaintiff Cotta has sufficiently alleged the element.

*17 (N.D. Cal. Nov. 1, 2021) ("As for PeopleConnect's second argument, it raises at most a factual dispute—i.e., were Plaintiffs' names and likeness sufficiently a part of the advertisements for PeopleConnect's products, or were they separate from and simply 'next to' these advertisement (and thus implied no endorsement or connection thereto)."). Accordingly, Plaintiff Cotta has properly alleged the commercial purpose element.

### c. Consent

Defendants contend that Plaintiff Cotta has not pleaded the consent Section 3344 element because Plaintiff "Cotta consented to [Instant Checkmate]'s use of her identity because her attorney agreed to the TOU," which includes an "express[] consent[] to the use and display of information about you" clause. Doc. No. 20-1 at 20.

The third element of Section 3344 requires the plaintiff to allege "lack of consent." *Eastwood*, 198 Cal. Rptr. at 347.

Here, the Court finds this element has been sufficiently alleged. Defendants argue Plaintiff Cotta "consented to [Instant Checkmate]'s use of her identity because her attorney agreed to the TOU." Doc. No. 20-1 at 20. Plaintiff Cotta provides in opposition that her "attorneys' research does not bind" her to the TOU as was discussed in relation to arbitration. Doc. No. 23 at 20. The Court agrees. For the reasons similar to those explained above, *see supra* Section II.C.1, Plaintiff Cotta did not agree to the TOU. In the Complaint, Plaintiff Cotta alleges that "Defendants never notified Plaintiffs and Class members that their names would appear on the Instant Checkmate Marketing Page in conjunction with an offer to purchase subscription access to its database reports" and "Plaintiff and members of the California Class never provided Defendants with their consent to use their identities in advertisements for Defendants' paid subscriptions." Compl. ¶¶ 30, 58. Thus, Plaintiff Cotta adequately alleges that she did not consent to use of her identity on the Website and therefore sufficiently pleads the third Section 3344 element.

### d. Resulting Injury

Defendants assert Plaintiff Cotta insufficiently pleads the injury element of Section 3344 because she has not alleged "any of the facts by which a non-celebrity plaintiff, such as Cotta, can allege an injury for purposes of § 3344." Doc. No. 20-1 at 21. Defendants further that Plaintiff Cotta does not claim "she suffered mental anguish due to the alleged use of her identity" and she makes a "conclusory allegation that [Instant Checkmate] 'derived economic value from [her],'" which make her pleadings insufficient. *Id.* (quoting Compl. ¶ 60). In opposition, Plaintiff Cotta argues that Defendants' argument was rejected by another district court in *Callahan*, whereby the court reasoned that "economic value may reasonably be inferred from PeopleConnect's use of the images to advertise, and this is sufficient to defeat a motion under Rule 12(b)(6)." Doc. No. 23 at 20; *Callahan II*, 2021 WL 5050079, at *15. Plaintiff Cotta also asserts that it is "well-settled that non-celebrities can bring claims under § 3344." Doc. No. 23 at 20. Defendants argue in reply that Plaintiff Cotta has failed to "allege[] facts showing that [her] personal endorsement has concrete, measurable, and provable value." Doc. No. 24 at 11 (quoting *Fraley*, 830 F. Supp. 2d at 800).

Section 3344 requires the plaintiff to plead a "resulting injury." *Eastwood*, 198 Cal. Rptr. at 347. "The statute's legislative history reveals section 3344(a) was intended to fill 'a gap which exist[ed] in the common law tort of invasion of privacy' as applied to non-celebrity plaintiffs whose names lacked 'commercial value on the open market.'" *Miller*, 72 Cal. Rptr. 3d at 204. Further, "section 3344 was enacted to provide a 'practical remedy for a noncelebrity plaintiff whose damages are difficult to prove.'" *Orthopedic Sys., Inc. v. Schlein*, 135 Cal. Rptr. 3d 200, 212 (Ct. App. 2011) (quoting *Miller*, 72 Cal. Rptr. at 205). As such, California courts have recognized that the core of a privacy case cause of action "is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which publication may have on the property, business, pecuniary interest, or the

standing of the individual in the community." *Fairfield v. Am. Photocopy Equip. Co.*, 291 P.2d 194, 197 (Ct. App. 1955).

Another district court illustrated the injury element under California law as it relates to sufficiency of pleading in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011).  The court provided that "[w]hile violation of one's right to publicity may result in 'injury to the feelings' that is wholly mental or subjective, California law has long recognized that 'where the identity appropriated has a commercial value, the injury may be largely, or even wholly, of an economic or material nature.'"  *Id.* at 806 (quoting *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 (9th Cir. 1974)). The court continued to tackle the issue and explained:

> [T]he Court finds nothing in the text of the statute or in case law that supports Defendant's interpretation of § 3344 as requiring a plaintiff pleading economic injury to provide proof of *preexisting* commercial value and efforts to capitalize on such value in order to survive a motion to dismiss. . . .  The statutory text makes no mention of preexisting value, and in fact can be read to presume that a person whose name, photograph, or likeness is used by another for commercial purposes without their consent is "injured as a result thereof."  Consistent with this reading, at least one court has suggested, after surveying California court decisions, that "courts generally presume that the fourth element of the applicable test has been established if there is sufficient evidence to prove the first three elements."

*Id.* at 806–07 (quoting *Del Amo v. Baccash*, No. CV 07-663-PSG, 2008 WL 4414514, at *6 (C.D. Cal. Sept. 16, 2008)); *see, e.g., Downing*, 265 F.3d at 1001–03.  The court further concluded that there was no "reason to impose a higher pleading standard on non-celebrities than on celebrities" because "California courts have clearly held that 'the statutory right of publicity exists for celebrity and non-celebrity plaintiffs alike.'"  *Fraley*, 830 F. Supp. 2d at 807 (quoting *KNB Enters. v. Matthews*, 92 Cal. Rptr. 2d 713, 722 n.12 (Ct. App. 2000)).  Although a plaintiff's level of "fame or notoriety of the identity appropriate" may lead to a greater amount of economic injury suffered, as the Ninth Circuit provided, "the appropriation of the identity of a relatively unknown person may

result in economic injury *or may itself create economic value in what was previously valueless*." *Id.* (quoting *Motschenbacher*, 498 F.2d at 825 n.11).  It thus follows that "courts have long recognized that a person's 'name, likeness, or other attribute of identity can have commercial value,' even if the individual is relatively obscure." *Id.* (quoting *Motschenbacher*, 498 F.2d at 825 n.10).  For these reasons, courts have found that "[i]f a defendant uses a plaintiff's name and/or likeness to advertise, then it can reasonably be inferred that the name and/or likeness has some economic value, even if small." *Callahan II*, 2021 WL 5050079, at *14; *Sessa*, 561 F. Supp. 3d at 1022 ("The use of an individual's likeness for commercial purposes, even of a relatively unknown person, establishes common law injury for right of publicity claims as long as the individual is recognizable."); *see also Kellman*, 2022 WL 1157500, at *4–6, 10; *Fraley*, 830 F. Supp. 2d at 799; *Lukis II*, 542 F. Supp. 3d at 842.

Here, Plaintiff Cotta sufficiently alleges injury under Section 3344.  Plaintiff Cotta provides in the Complaint that "[b]y using their identities in advertisements to sell their services, Defendants derived economic value from Plaintiff and the California Class members' identities and, in turn, deprived Plaintiff and the California Class members of such value."  Compl. ¶ 60.  Defendants did not compensate Plaintiff Cotta for such use, Plaintiff Cotta alleges, and thus economic injury resulted.  *Id.*  Plaintiff Cotta's allegations provide that Defendants' Website leaves users with limited access after completing a search on the Website.  The user is faced with a "teaser" of what information the website contains, which the user may only view upon payment of a fee for subscription.  It is Defendants' use of Plaintiff Cotta's name, identity, and other information to entice users to purchase a subscription without her consent or compensating her that is at issue in this case.  And she sufficiently provides that the "resulting injury" is Defendants' derivation of economic value from Plaintiff Cotta with their commercial use of her identity and other information without providing compensation for such use.  It appears that, like other courts have found, Plaintiff Cotta's sufficient pleading of use of her likeness to advertise is enough show an inference of

injury via economic value.  *See, e.g.*, *Kellman*, 2022 WL 1157500, at *4–6, 10; *Callahan II*, 2021 WL 5050079, at *14; *Lukis II*, 542 F. Supp. 3d at 843.  Therefore, the Court finds that Plaintiff has adequately alleged the injury element and has thus sufficiently alleged a prima facie claim under Section 3344.  The Court **DENIES** Defendants' motion to dismiss on this basis.

### e.    Public Interest Exception

Finally, Defendants argue that even if Plaintiff Cotta could sufficiently plead the required Section 3344 elements, her claim should nonetheless be dismissed because her alleged use of identity falls within the "public affairs" exception under Section 3344. Doc. No. 20-1 at 21.  Defendants specifically argue that Instant Checkmate "provides the public with a searchable online database" that contains detailed reports, which are acquired from public records, about anyone.  *Id.* at 22.  To support this argument, Defendants contend that the Website contains information that could include a person's criminal history, marriage records, or other valuable information, which "is information 'related to real-life occurrences'" and certainly falls within information that informs or entertains.  *Id.* (quoting *Dora v. Frontline Video, Inc.*, 18 Cal. Rptr. 2d 790, 794 (Ct. App. 1993)).  Plaintiffs argue in opposition that Defendants line of argument is incorrect "because the challenged conduct is advertising that proposes a commercial transaction." Doc. No. 23 at 21.  Plaintiffs assert that, like in *Callahan*, Defendants' subscription does not have a potential public affairs connection and thus cannot fall within the exception. *Id.*

Section 3344(d) provides an exception to the right of publicity statute for "a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign."  Cal. Civ. Code § 3344(d).  A statutory right of publicity cause of action will be barred "for 'the publication of matters in the public interest, which rest[] on the right of the public to know and the freedom of the press to tell it.'"  *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639, 640 (Ct. App. 1995) (quoting *Dora*, 18 Cal Rptr. at 792).  This

exception "extends 'to almost all reporting of recent events,' as well as to publications about 'people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities.'"  *Downing*, 265 F.3d at 1001 (quoting *Eastwood*, 198 Cal. Rptr. at 350).  The public affairs exception is not unlimited, however, such that there is "'a proper accommodating between [the] competing concerns' of freedom of speech and the right of publicity."  *Id.* (quoting *Eastwood*, 198 Cal. Rptr. at 350); *see Zacchini*, 433 U.S. at 574; *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) ("The guarantees for speech and press are not the preserve of political expression or common upon public affairs."); *Dora*, 18 Cal. Rptr. 2d at 792. "Matters in the public interest" have been defined as: "The privilege of printing an account of happenings and of enlightening the public as to matters of interest is not restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with the reproduction of past events, travelogues and biographies."  *Carlisle v. Fawcett Publ'ns, Inc.*, 20 Cal. Rptr. 405, 414 (Ct. App. 1962).

Here, as alleged, once a user performs a free name search, the Website displays "the searched individual's full name alongside certain uniquely identifying information," which is accompanied by an offer to subscribe to the Website's subscription service. Compl. ¶¶ 2, 26–28.  The teaser invites users to pay for a subscription that allows them to acquire more information about a searched-for name without even touching any general public interest issue.  Additionally, Defendants have not pointed to anything that would render the information in the teasers generally newsworthy.  Even if the Court were to find Plaintiffs' underlying actions, which could be displayed on the Website, are newsworthy, the Complaint concerns Plaintiff Cotta's allegations that Defendants used her information for a commercial purpose in the context of a teaser to sell subscriptions— not in a news context or any other context that is related to any public interest.  *See Abdul-Jabbar*, 85 F.3d at 406 ("While [Kareem Abdul-Jabbar's] basketball record may be said to be 'newsworthy,' it is not automatically privileged.  GMC used the information in the context of an automobile advertisement, not in a news or sports account.  Hence

GMC is not protected by section 3344(d).").  Further, while it could be the case that Defendants operate a website that contains matters of general interest, their particular use of Plaintiff Cotta's persona that is alleged in the present case is for wholly commercial reasons that are not tied to a meaningful public interest—again, the same result the Court reaches *supra* Section IV.B.2. and IV.C.1.e.  The Court therefore rejects Defendants' request to dismiss the claim pursuant to the Section 3344(d) exception.  Again, this same result has been reached by other courts in this Circuit that have considered the issue as it relates to a substantially similar website.  *See, e.g.*, *Callahan II*, 2021 WL 5050079, at *15; *Sessa*, 561 F. Supp. 3d at 1031; *Fraley*, 830 F. Supp. 2d at 805; *Martinez v. ZoomInfo Techs. Inc.*, No. C21-5725 MJP, 2022 WL 1078630, at *6 (W.D. Wash. Apr. 11, 2022), *appeal docketed*, No. 22-35305 (9th Cir. Apr. 15, 2022).

Accordingly, the Court **DENIES** Defendants motion to dismiss on this basis.

### 2.    Alabama Claim - ARPA

Defendants move to dismiss Plaintiff Camacho's Alabama Right of Publicity Act ("ARPA") claim on the grounds that Plaintiff Camacho fails to plead a prima facie claim under the statute and two statutory exceptions and a territorial pleading failure bar the claim.  *See* Doc. No. 20-1 at 22–26.

ARPA[11] provides in part:

> [A]ny person or entity who uses or causes the use of indicia of identity of a person, on or in products, goods, merchandise, or services entered into commerce in this state, or for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services, or for purposes of

---

[11] Alabama recognized a common law right of privacy prior to passage of the Act in 2015.  *See Minnifield v. Ashcraft*, 903 So.2d 818, 824 (Ala. Civ. App. 2004) ("Although the Alabama Supreme Court has addressed the tort of commercial appropriation only twice and thus has provided us with little guidance in determining the contours of the cause of action, we read Alabama law to permit a cause of action for invasion of privacy when the defendant appropriates without consent the 'plaintiff's name or likeness to advertise the defendant's business or product, or for some other similar commercial purpose.'" (quoting *Kyser-Smith v. Upscale Commc'ns, Inc.*, 873 F. Supp. 1519, 1525 (M.D. Ala. 1995))).

fund-raising or solicitation of donations, or for false endorsement, without consent shall be liable under this article to that person, or to a holder of that person's rights.

Ala. Code §6-5-772(a).  The Act defines "indicia of identity" as "those attributes of a person that serve to identify that person to an ordinary, reasonable viewer or listener, including, but not limited to, name, signature, photograph, image, likeness, voice, or a substantially similar imitation of one or more of those attributes." *Id.* § 6-5-771(1). The right of publicity applies to "every person, whether or not famous." *Id.* § 6-5-771(3). Additionally, liability exists "without regard as to whether the use is for profit or not for profit." *Id.* § 6-5-772(b).  The ARPA also contains exceptions for "use of the indicia of identity is in connection with a news, public affairs, or public interest account, . . . or is part of an artistic or expressive work." *Id.* § 6-5-773.

a.   Prima Facie Claim Under ARPA

Defendants assert that Plaintiff Camacho insufficiently pleads "use" of his identity and that his identity was used for a commercial purpose, and they argue he consented to use of his identity.  Doc. No. 20-1 at 23.  Defendants provide that Plaintiff Camacho's "allegations suffer from the same pleading deficiencies as [Plaintiff] Cotta's." *Id.* Defendants briefly summarize the arguments they previously made as to Section 3344. *Id.*  In opposition, Plaintiffs clump together their arguments as to each disputed prima facie element for both the Alabama and California claims. *See* Doc. No. 23 at 17–20. Defendants do the same in reply. *See* Doc. No. 24 at 9–11.

Plaintiffs and Defendants appear to both acknowledge the similarity between ARPA and Section 3344—evidenced by the fact that Defendants' arguments challenging the sufficiency of Plaintiffs' pleading of both claims are the same.  Doc. No. 20-1 at 23. Defendants do not provide any different analysis under ARPA, nor do they distinguish the statutes. *See id.*  Similarly, Plaintiffs do not provide analysis under ARPA that is different than under Section 3344, and do not distinguish the statutes. *See* Doc. No. 23 at 17–20.  In fact, Plaintiffs assert later in their opposition that "the elements required to

allege a violation of ARPA and § 3344(a) are markedly similar" and there is "overlap between California and Alabama's publicity statutes." *Id.* at 16, 23.  As demonstrated by both parties' identical arguments for state's claims, it appears that the parties agree the statutes are not notably distinguishable at this stage of the case.  As such, the Court reaches the same conclusion for the ARPA prima facie claim as it does above for Section 3344, *see supra* IV.C.1.

Accordingly, the Court finds that Plaintiff Camacho has sufficiently pleaded a prima facie claim under ARPA.  The Court **DENIES** Defendants' motion on this basis.

### b.   ARPA Statutory Exceptions

Defendants also argue Plaintiff Camacho's ARPA claim is barred because it falls within two ARPA exceptions.  Doc. No. 20-1 at 23.

#### i.   *Public Interest Exception*

Defendants first argue it is exempt from liability pursuant to the "public interest" exemption under ARPA.  *Id.*  Defendants reason that Alabama common law broadly construes a "public interest" protection, which Defendants argue extends to information that is of legitimate public concern, and public records fall within the protection under Alabama law.  *Id.* at 24.  Defendants, in applying Alabama common law, provide that the rendered reports on the Website are "'compiled' from 'public record repositories' and contain 'highly valuable information,' about human activity including 'criminal history,' and 'marriage records.'"  *Id.* (quoting Compl. ¶¶ 24, 25).  Plaintiff Camacho asserts in opposition that the public interest exception "applies to matters like live broadcasts (e.g., news, political, or sporting events) or live performances (e.g., plays, films, or movies)."  Doc. No. 23 at 21.  Elaborating on this issue, Plaintiff Camacho asserts the public interest exception "does not apply here because the *content* of Defendants' databases—e.g., any information about the Plaintiff—is not at issue[;]" the "[W]ebsite uses Plaintiffs' and other class members' names and identities to advertise its *subscription service* and not individual reports about consumers."  *Id.* at 22.  Further, Plaintiff Camacho states that "even if Defendants did sell or advertise individual reports . . . , the pleadings make clear

that 'public records' only comprise '*part*' of Defendants' database. . . .  Thus, it is impossible to determine without discovery whether the information used by Defendants fits the statutory exception." *Id.* (citation omitted).  In reply, Defendants argue in response to Plaintiff Camacho's assertion that the advertisement is for a subscription that "the subscription provides access to the background reports—not an unrelated product—so an advertisement for the subscription *is* protected."  Doc. No. 24 at 12.

ARPA outlines an exemption from liability for "use of the indicia of identity [] in connection with a news, public affairs, or public interest account."  Ala. Code § 6-5-773(b).

Here, for the same reasons the Court finds that the Section 3344 public interest exception does not bar Plaintiff Cotta's California claim at the pleadings stage, *see supra* Section IV.C.1.e, the Court rejects Defendants' argument that the ARPA public interest exception bars Plaintiff Camacho's claim at this stage.  As to Defendants' argument that the subscription is for a related product, the Court similarly finds that this is not the case as pleaded in this action, *see supra* Section IV.C.1.b.  Accordingly, the Court **DENIES** Defendants' motion to dismiss on this basis.

### ii.   Expressive Work Exception

Defendants also assert Plaintiff Camacho's claim falls within the "expressive work" exception and thus the claim is barred.  Doc. No. 20-1 at 24.  Defendants support their argument by analyzing the "plain meaning of the term 'expressive works'"—with citations to Merriam-Webster Dictionary—and asserting that "expressive works" includes "detailed reports about people" in light of the provided definitions.  *Id.* at 25.  Specifically, Defendants contend "'[t]he comprehensive background reports' are 'works' because they are written documents 'compiled' 'from databases and public record repositories'" and they are "'expressive' because they 'express,' 'represent,' or 'convey[]' information . . . including 'high value information' about people[]."  *Id.* (quoting Compl. ¶¶ 24, 25).  Plaintiff Camacho, in turn, asserts that Defendants' argument lacks merit for two reasons.  Doc. No. 23 at 22.  First, Plaintiff Camacho

contends that the case is about the contents of Defendants' subscription service advertisements and not the "contents of their databases or any individual 'report,'" and use of Plaintiff Camacho's identity for the advertisement "does not fall under the statutory exception." *Id.* Second, Plaintiff Camacho points out that Defendants' interpretation of the statute is broad and "would apply to anything written or spoken that 'expresses' or 'conveys' information." *Id.* at 23. Rather, as Plaintiff Camacho argues, "[t]he language of ARPA . . . forecloses [Defendants'] interpretation, and shows the exception is reserved for *actual* artistic or expressive works, like live performances, plays, or movies." *Id.*

ARPA provides an exemption from liability for use of identity as "part of an artistic or expressive work, such as a live performance, work of art, literary work, theatrical work, musical work, audiovisual work, motion picture, film, television program, radio program or the like (artistic work)." Ala. Code § 6-5-773(b).

Here, the Court finds Defendants' argument unpersuasive and agrees with Plaintiff Camacho. Whether the underlying "reports" are considered "expressive works," is not at issue in the present action. Plaintiff Camacho is not challenging in the Complaint Defendants' use of his identity on their database; rather, he is challenging Defendants' display of his name and information in a "teaser" intended to solicit users to subscribe to Defendants' service. As alleged in the Complaint, the use of Plaintiff Camacho's identity and information in Defendants' advertisements does not seem to fall within the "expressive work" exception and bar Plaintiff Camacho's claim at this stage of the proceedings. Accordingly, the Court **DENIES** Defendants' motion on this ground.

        c.   <u>Territorial Scope</u>

Defendants lastly argue that Plaintiff "Camacho must allege a sufficient nexus between his claim and Alabama" and fails to do so. Doc. No. 20-1 at 25. Defendants argue that "[u]nder Alabama law, a statute does not have 'extraterritorial effect' unless it 'explicitly provide[s] for that effect,'" and "[b]ecause ARPA does not, [Plaintiff] Camacho must allege a sufficient nexus between his claim and Alabama. He fails to do

so."[12]  *Id.* (quoting *Ex Parte Old Republic Sur. Co.*, 733 So.2d 881, 884 (Ala. 1999)). Defendants assert that Plaintiff Camacho has not alleged conduct occurred in Alabama and ARPA can only apply in Alabama—that the law has no extraterritorial effect, and a plaintiff must thus allege a nexus to that state.  *Id.* at 25–26.

ARPA provides no explicit requirement that a person in Alabama view the misappropriated identity or likeness—so there is no explicit extraterritorial requirement. *See* Ala. Code § 6-5-770 to -773.  Additionally, to the extent that Alabama law *requires* a plaintiff to show a nexus between the claim and Alabama, the Court need not perform a deep dive into Alabama law to address this issue.  Plaintiff Camacho pleads he "discovered that Defendants were using [his] identit[y] to solicit the purchase of paid subscriptions to InstantCheckmate.com," and Plaintiff Camacho is a resident of Alabama. Compl. ¶¶ 7, 31.  Even though the Complaint does not specify where Plaintiff Camacho's discovery of Defendants' use took place, he is nonetheless a resident of Alabama and Defendants operate a website that is generally available to people in Alabama.  *See Kellman*, 2022 WL 1157500, at *8.[13]  Therefore, the Court can reasonably conclude that Plaintiff Camacho's discovery occurred in Alabama.  Further, the Court acknowledges that "[e]xtraterritoriality . . . is a complicated issue and different states and different

---

[12] Defendants assert Alabama courts consider a two-part test to determine whether a sufficient nexus exists.  Doc. No. 20-1 at 25–26 ("(1) [W]hether 'the enforcement of the statute would impose a burden on a noncitizen of Alabama'; and (2) whether enforcement of the statute 'would impose upon [the defendant] a burden based upon a right or claim that did not vest while [the defendant] was in Alabama.'" (quoting *Ex parte Old Republic*, 733 So.2d at 885)).  It does not appear to be the case, nor does this Court need to consider whether, Alabama courts utilize a two-part test to determine whether a sufficient nexus exists to fulfill extraterritoriality.  Rather, the "test" cited to seems to be just part of a 1999 Supreme Court of Alabama case that implicated a state law concerning dealer bonds—a state law that is not relevant here and in a time when the internet was not what it has become today.  Thus, the Court declines to entertain this type of analysis on these facts.

[13] As to similar persuasive cases, the Court notes that a similar case pending in another court in this Circuit reached an opposite conclusion.  *See Boshears*, 2022 WL 888300, at * 3.  That case is distinguishable from the present action because the Indiana right of publicity statute at issue in that case explicitly contained a territorial requirement.  *Id.*  However, ARPA includes no such requirement— taking this case into a different realm than that case.

statutes take different approaches." *Kellman*, 2022 WL 1157500, at *8 (noting that "[o]ther courts have deferred determination of this issue until there has been discovery"). The Court finds Defendants' reliance on *McGoveran v. Amazon Web. Servs., Inc.*, C.A. No. 20-1399, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021) unpersuasive. It is not Plaintiff Camacho's residency alone that causes the Court to reach this outcome. It is the combination of this factor, the other authorities, and Defendants' operation of a website that is available to Alabamans that the Court reaches its conclusion. At this juncture of the case, the Court finds Plaintiff Camacho has satisfied any "territoriality" requirement. Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff Camacho's ARPA claim on this basis.

### 3.   Conclusion

In sum, the Court **DENIES** Defendants' motion to dismiss Plaintiff Cotta's California claim for failure to state a claim and **DENIES** Defendants' motion to dismiss Plaintiff Camacho's Alabama claim for failure to state a claim.

## D.   Anti-SLAPP Statute

Defendants lastly argue that Plaintiffs' claims are barred by California's anti-SLAPP statute. Doc. No. 20-1 at 34.

California Code of Civil Procedure § 425.16 governs anti-SLAPP motions and "allows a defendant to gain early dismissal of a lawsuit that qualifies as a SLAPP," and are essentially "designed to primarily chill the exercise of the First Amendment rights." *Siam v. Kizilbash*, 31 Cal. Rptr. 3d 368, 373 (Ct. App. 2005); *Callahan v. Ancestry.com Inc.*, No. 20-cv-08437-LB, 2021 WL 783524, at *7 (N.D. Cal. Mar. 1, 2021). The Ninth Circuit previously supplied that "[t]he anti-SLAPP statute was designed to curtail these lawsuits by establishing a procedure to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 682 (9th Cir. 2005). Given the general anti-SLAPP statute's purpose, it must be construed broadly. Cal. Civ. Proc. Code § 425.16(a); *Flatley v. Mauro*, 139 P.3d 2, 10 (Cal. 2006). In relevant part, Section 424.16 reads:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1). The Ninth Circuit has instructed that the anti-SLAPP statute is available in federal court. *Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206–07 (9th Cir. 2005) (per curiam). In considering an anti-SLAPP motion, the court utilizes a two-step process. *Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 694 (Cal. 2002). "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." *Id.* As to this first step, "[t]he moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendants]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute." *Id.* (quoting Cal. Civ. Proc. Code § 425.16(b)(1)). Second, "[i]f such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." *Id.* Essentially, a claim is only subject to dismissal if it "satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit." *Navellier v. Sletten*, 52 P.3d 703, 708 (Cal. 2002).

Here, the information included in Defendants' advertisements is not an issue of public interest as alleged in the Complaint, *see supra* Section IV.C.1.e, which renders Defendants' motion to strike argument that the search results are protected speech connected to matters of public concern unpersuasive, *see* Doc. No. 20-1 at 34. As previously discussed, *see supra* Sections IV.B.2 and IV.C.1.e, the information provided in Defendants' teasers does not involve public issues that would fall within the purview of protected speech as required by the first step of anti-SLAPP analysis. Thus, the first prong cannot be met at the outset. As such, the Court **DENIES** Defendants' request to strike Plaintiffs' claims under California's anti-SLAPP statute.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### V. CONSOLIDATION

Currently pending before this Court are three actions brought by Plaintiffs against Defendant TCG and its associated companies and websites, alleging California and Alabama right of publicity claims.[14]  *See* Case No. 21-cv-1954-MMA (MDD), Doc. No. 1; Case No. 21-cv-1957-MMA (JLB), Doc. No. 1; Case No. 22-cv-209-MMA (MDD), Doc. No. 1.

On May 3, 2022, the Court directed the parties to meet and confer and file a joint status report concerning consolidation.  *See* Case No. 21-cv-1954-MMA (MDD), Doc. No. 28; Case No. 21-cv-1957-MMA (JLB), Doc. No. 28; Case No. 22-cv-209-MMA (MDD), Doc. No. 18 ("May 3, 2022 Orders").  In their joint status reports, the parties in each of the cases indicated that they met and conferred and agreed that the cases should be consolidated.  *See* Case No. 21-cv-1954-MMA (MDD), Doc. No. 30; Case No. 21-cv-1957-MMA (JLB), Doc. No. 29; Case No. 22-cv-209-MMA (MDD), Doc. No. 22.

As the Court previously indicated in its May 3, 2022 Orders, it appears there is substantial similarity between the three complaints, the motions to dismiss briefing, the parties bringing the action and the parties against whom the action is brought, the documents filed, and parties' counsel.  *See* Fed. R. Civ. P. 42(a) (providing that "[i]f actions before the court involve a common question of law or fact, the court may: . . . consolidate the actions").

Accordingly, civil case numbers 21-cv-1954-MMA (MDD), 21-cv-1957-MMA (JLB), and 22-cv-209-MMA (MDD) are hereby **CONSOLIDATED** under the present case, number 21-cv-1954-MMA (MDD) (the "Consolidated Case").

The Court notes that nearly identical motions have been filed in these cases.  *See* Case No. 21-cv-1954-MMA (MDD), Doc. Nos. 20, 23, 24; Case No. 21-cv-1957-MMA

---

[14] Defendant TCG is a defendant in all three cases, and each of the three cases is also brought against companies that are alleged to be operated or controlled by Defendant TCG.  *See* Case No. 21-cv-1954-MMA (MDD), Doc. No. 1 ¶¶ 1, 9, 21–23; Case No. 21-cv-1957-MMA (JLB), Doc. No. 1 ¶¶ 1, 9, 21–23; Case No. 22-cv-209-MMA (MDD), Doc. No. 1 ¶¶ 1, 11, 22–24.

(JLB), Doc. Nos. 19, 22, 23; Case No. 22-cv-209-MMA (MDD), Doc. No. 16.  The Court will simultaneously issue orders, substantively the same as the content contained herein, on the three pending motions.

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion to compel arbitration, **DENIES** Defendants' motion to strike, and **DENIES** Defendants' motion to dismiss.

The Court **DIRECTS** all Defendants to file an answer in the Consolidated Case on or before **August 15, 2022**.

**IT IS SO ORDERED**.

Dated:  July 18, 2022

HON. MICHAEL M. ANELLO
United States District Judge